## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| GRUPO PETROTEMEX, S.A. DE C.V. and DAK AMERICAS LLC, | ) ) ) | Civil Action No. 16-cv-02401 SRN/HB |
| Plaintiffs, | ) ) | **DEFENDANT POLYMETRIX AG'S** |
| v. | ) ) ) | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| POLYMETRIX AG, | ) ) ) | **PURUSANT TO FED.R.CIV.P. (12)(b)(1)** |
| Defendant. | ) ) ) | |

Defendant Polymetrix AG ("Polymetrix") submits this memorandum of law in support of its motion under Fed.R.Civ.P. 12(b)(1) to dismiss the Complaint of Plaintiffs Grupo Petrotemex, S.A. de C.V. and DAK Americas LLC's ("GPT/DAK") for lack of subject matter jurisdiction.

## I.     INTRODUCTION

The Court should dismiss GPT/DAK's Complaint for lack of subject matter jurisdiction because on July 12, 2016 when GPT/DAK filed their Complaint, there was no real and immediate injury or threat of injury that was caused by Polymetrix. Accordingly, there is no "case" or "controversy" that is justiciable under Article III of the Constitution to warrant the declaratory relief that GPT/DAK effectively seeks by way of its Complaint.

Briefly, Polymetrix is an engineering company located in Switzerland that supplies equipment and engineering for the construction of processes used in manufacturing plants. GPT/DAK accused Polymetrix's EcoSphere™ process of infringing the methods claimed in the patents-in-suit. The EcoSphere™ process is a process used in the manufacture of polyethylene terephthalate ("PET"), a product used to make, for example, water bottles. There are no EcoSphere™ plants built or operating in the U.S., nor are there any planned to be built in the U.S. In fact, there are only two EcoSphere™ plants built anywhere in the world, one in Poland and one in China. Polymetrix does not own either of these plants. Polymetrix does not manufacture PET, does not own any plants that manufacture PET and does not export or import PET anywhere in the world. Because the only two EcoSphere™ plants in existence are located outside the U.S., the only possible basis for infringement would be if PET manufactured at either the Poland plant or the China plant is imported into the U.S., and Polymetrix actively induced that importation.

The Poland plant is the only EcoSphere™ plant in commercial operation in the world. Importantly, this fact was unknown to GPT/DAK at the time they filed their Complaint and they only learned of its existence after this lawsuit was filed when Polymetrix's counsel informed them of its existence and the fact that there were no EcoSphere™ plants built or operating in the U.S. Nevertheless, from the time the Poland plant began its commercial operation until today, there has been no PET manufactured at this plant imported into the U.S. Regarding the China plant, there is no dispute that the China plant was not in commercial operation as of July 12, 2016, the filing date of the

Complaint.  In fact, the China plant was not even completed mechanically and electrically until at least mid-2017, almost 1 year <u>after</u> GPT/DAK filed their Complaint. There is also no dispute that the China plant is not in commercial operation today, nearly 2 years <u>after</u> GPT/DAK filed their Complaint, and it is still unknown when the China plant will commence commercial operation or whether PET from the China plant will be exported to the U.S.

Significantly, GPT/DAK knew at the time they filed their Complaint that the China plant was not in commercial operation and were unaware that the only operating EcoSphere™ plant was in Poland.  Thus, if truth be told by GPT/DAK, the sole impetus for filing their Complaint was a subjective fear of a potential future harm based upon the hypothetical and speculative importation into the U.S. of PET manufactured at the China plant whenever it commences commercial operation.  This impetus is corroborated by the prior conduct of DAK Americas, LLC "DAK"), one of the plaintiffs in this case.  In that regard, in April, 2016, three months before GPT/DAK filed this lawsuit, DAK successfully petitioned the U.S. International Trade Commission to impose 153.3% antidumping and countervailing duties on PET imports from China.  These AD/CVD duties makes it extremely unlikely and hypothetical that PET from the China plant will be exported into the U.S. whenever the China plant commences commercial operation. Ironically, this unlikelihood was created by Plaintiff DAK as a direct consequence of its successful ITC petition.

Frankly, all that GPT/DAK actually seeks with respect to the Poland and China plants is an unconstitutional advisory opinion that when and if PET manufactured at

either of these plants is ever imported into the U.S., such product would be "product which is made by a process patented in the United States" and thus patent infringement under 35 U.S.C. § 271(g). This Court cannot give an opinion advising what the law would be on a hypothetical state of facts. For that reason, the Court should grant Polymetrix's motion to dismiss for lack of subject matter jurisdiction related to the Poland and China plants. With the benefit of hindsight, it has been almost two years since GPT/DAK filed their Complaint and there has never been any importation of PET into the U.S. from the Poland plant, and the China plant is still not in commercial operation. As a result, no case or controversy of sufficient "immediacy" or "reality" existed as of the day GPT/DAK filed their Complaint nor does a case or controversy exist today since nothing has changed in that regard during the 2 years since that date.

The mere existence of the Poland and China plants does not cause an injury nor create an imminent risk of injury to GPT/DAK, especially when there was no importation from the Poland plant prior to the Complaint. GPT/DAK's subjective fear of a future "harm" that may or may not occur in the future cannot be the basis of an Article III case or controversy just as the mere existence of a patent, without more, does not cause an injury nor create an imminent risk of injury to a party seeking a declaration of non-infringement. Under the U.S. patent laws, Polymetrix was legally entitled to provide equipment and engineering used in the construction of the EcoSphere™ plants in Poland and China because those processes are located and operated outside of the U.S. Polymetrix should not be hailed into court in the U.S. simply because GPT/DAK fears that someday PET <u>may</u> be imported into the U.S. from one of these plants.

Given the breadth of the allegations in GPT/DAK's Complaint, the only other possible basis for an "injury-in-fact" to create a justiciable controversy would be from offers made by Polymetrix to supply engineering and equipment to build an EcoSphere™ plant in the U.S., or retrofit an existing plant in the U.S. with the EcoSphere™ process. Logically, because there are no EcoSphere™ plants designed, built or operating in the U.S. at any time before or since the filing of the Complaint on July 12, 2016, any offers made by Polymetrix to supply engineering and equipment to build an EcoSphere™ plant in the U.S. necessarily means that any such offers were not accepted. There is no dispute on that point. But even if there were such offers made, the Federal Circuit, however, has made clear that an offer to sell equipment to perform a process is not an "offer to sell" within the meaning of 35 U.S.C. § 271(a). Therefore, as a matter of law, any offers made by Polymetrix to supply engineering and equipment to build an EcoSphere™ plant in the U.S., or retrofit an existing plant in the U.S. with the EcoSphere™ process, do not constitute an infringing offer under § 271(a). By the way, even if it made a difference to this analysis, there are no existing accepted or pending offers from Polymetrix to build an EcoSphere™ plant in the U.S., or to retrofit an existing plant in the U.S. with the EcoSphere™ process.

Correspondingly, there is no "case or controversy" regarding any offers for sale made by Polymetrix to build an EcoSphere™ plant in the U.S., or retrofit an existing plant in the U.S. Here too, all that GPT/DAK actually seeks with respect to any "offers to sell" is an unconstitutional advisory opinion that had any such offers been accepted and the EcoSphere™ plants built in the U.S., Polymetrix would have been liable for

inducing infringement under 35 U.S.C. § 271(b), assuming GPT/DAK could prove the performance of the EcoSphere™ process infringes one of the patents-in-suit. Again, this Court cannot give an opinion advising what the law would be on a hypothetical state of facts.

Finally, even if GPT/DAK could establish an "injury-in-fact" that is "fairly traceable" to Polymetrix's conduct in connection with the Poland and China plants, this "injury" is not redressable by the Court. Because there has been no importation from the Poland and/or China plants, and because any unaccepted "offers for sale" do not constitute an infringement, there are no damages and will be no damages in this case. This leaves injunctive relief as GPT/DAK's sole potential remedy for the hypothetical importation of PET into the U.S. made at the Poland or China plants.

But the Court is without power to enjoin that hypothetical importation. At best, the Court can only issue an injunction enjoining Polymetrix (and those in active concert or participation), from not doing what it already does not and will not do, which is export, or aid and abet some other entity in exporting, PET to the U.S. that is made at the Poland plant or will be made at the China plant. Indeed, the Court has no subject matter jurisdiction, let alone personal jurisdiction, over the purported hypothetical "exporters" because, to date, they have not exported PET from these plants to the U.S. Therefore, even if the owners of the Poland and China plants did have future intentions to export product to the U.S., the Court could not enjoin that importation with an injunction under Fed.R.Civ.P. 65 (d)(2) because Polymetrix has no control over these entities.

In short, the underlying case or controversy question that the Court must answer is whether the facts as alleged in GPT/DAK's Complaint filed on July 12, 2016, under all of the circumstances, show that there is a substantial controversy between the parties of sufficient immediacy and reality to create a justiciable controversy under Article III of the Constitution. With the benefit of hindsight, the Court can plainly answer this question, no. During the almost two years that has elapsed since GPT/DAK filed their Complaint on July 12, 2016, nothing has changed in the status of the events as they existed on July 12, 2016, other than the significant unnecessary legal fees that Polymetrix was forced to incur in defending itself against the exceptionally meritless claims in GPT/DAK's Complaint.

In view of its recent decision in *Luminara* v. *Liown*, this Court knows that the Federal Circuit has found delays of nine months or more between filing and potential infringement to be too indefinite to warrant declaratory relief. Again, with the benefit of hindsight over the approximate 2 years since GPT/DAK filed their Complaint, the Court can unequivocally conclude that GPT/DAK's subjective fear of harm was nothing more than conjectural and hypothetical. Indeed, nothing has changed with respect to importation. Polymetrix did absolutely nothing wrong before the Complaint was filed and has done nothing wrong since. Rather, all it did was supply equipment and engineering services that were used in the construction of the EcoSphere™ plants in Poland and China, which it is legally entitled to do under U.S. patent laws.

This Court should dismiss GPT/DAK's Complaint in its entirety for lack of subject matter jurisdiction.

## II.    STATEMENT OF FACTS

On July 12, 2016 GPT/DAK filed a Complaint against Polymetrix for allegedly infringing U.S. Patent Nos. 7,192,545; 7,790,840 and 7,868,125 ("the patents-in-suit"). [Doc. No. 1]  All of the claims in these patents are method claims, directed to various aspects of processes used in the manufacture of PET.  As briefly mentioned at the outset, Polymetrix is a process engineering company that supplies equipment, designs and engineering services used in the manufacturing facilities of its customers.  (Declaration of Martin Müller, ¶ 2) (hereinafter "Müller Decl.")  Polymetrix is not a manufacturer of PET, an exporter of PET, an importer of PET or a distributor of PET.  (Müller Decl., ¶ 2) Moreover, Polymetrix has not and will not import nor assist any entity, including its customers, in the exportation of PET to the U.S.  (Müller Decl., ¶ 2)

There is only one EcoSphere™ process currently operating anywhere in the world and that is in Wloclawek, Poland ("the Poland plant").  (Müller Decl., ¶ 3) (Declaration of Andreas Christel, ¶ 4) (hereinafter "Christel Decl.")

This plant is owned by Indorama Ventures Poland S.p.z.o.o ("Indorama Ventures Poland").  On March 27, 2013, Polymetrix entered into a contract with Indorama Ventures Poland to revamp Indorama Ventures Poland's conventional PET manufacturing facility in Wloclawek, Poland with the EcoSphere™ process.   (Müller Decl., ¶ 4) (Christel Decl., ¶ 5) Polymetrix's contract with Indorama Ventures Poland was only for equipment supply and engineering services related to the installation of that equipment and site assistance for start-up.  (Müller Decl., ¶ 4) (Christel Decl., ¶ 5) Polymetrix completed its portion of the engineering and equipment supply for the Poland

plant and pre-conditioned/commissioned the plant in early 2014.  (Müller Decl., ¶ 5) (Christel Decl., ¶ 7)  Other than equipment related issues, after the start-up of the Poland plant, Polymetrix had no involvement, and continues to have no involvement, in the operation of the Poland plant or in the sales of PET manufactured at the plant.  (Müller Decl., ¶ 4) (Christel Decl., ¶ 5)

From the initial contact with Indorama Ventures Poland through the present, no one at Polymetrix was involved in any discussions with Indorama Ventures Poland concerning the sales of PET manufactured at the Poland plant.  (Müller Decl., ¶ 5) (Christel Decl., ¶ 7)  Indorama Ventures Poland's sales of PET manufactured at the Poland plant has never been a topic of conversation or any communication between Polymetrix and Indorama Ventures Poland.  (Müller Decl., ¶ 5)  Nevertheless, as shown in the publicly available shipping database data, there has been no exportation of PET manufactured at the Poland plant into the U.S. since it began commercial operation in 2014.  (Declaration of Todd A. Noah, Exhibit A) (hereinafter "Noah Decl.")

Other than the Poland plant, the only other EcoSphere™ plant existing in the world is located in Jiangyin City, Jiangsu Province, China ("the China plant ") and is owned by Jiangyin Chengold Packaging Materials Co., Ltd. ("Chengold").  Polymetrix provided equipment and engineering services pursuant to a 2015 subcontract agreement with Chemtex International, Inc., the general contractor hired to build the China plant. (Müller Decl., ¶ 6) (Christel Decl., ¶ 8)  Although Polymetrix completed its portion of the equipment supply and engineering for the China plant and pre-conditioned/commissioned the plant in mid-2017, the China plant was not ready for commercial operation at that

time and still is not ready today.  (Müller Decl., ¶ 7) (Christel Decl., ¶ 9) Thus, the China

plant was not in commercial operation on July 12, 2016 when GPT/DAK filed their

Complaint nor is it in commercial operation today.  (Müller Decl., ¶ 7) (Christel Decl., ¶

10)  Polymetrix does not know when the China plant will commence commercial

operation.  (Müller Decl., ¶ 8) (Christel Decl., ¶ 10)

Polymetrix's principal contact during the construction of the China plant was

Chemtex International.  (Müller Decl., ¶ 8) (Christel Decl., ¶ 8)  Polymetrix had very

little contact with Chengold during the construction of the China plant and through the

present.  (Müller Decl., ¶ 8) (Christel Decl., ¶ 11)  From the initial contact with Chemtex

International through the present, no one at Polymetrix was involved in any discussions

with Chemtex International or Chengold concerning the future sales of PET

manufactured at the China plant.  (Müller Decl., ¶ 8) (Christel Decl., ¶ 11)  Chengold's

future sales of PET manufactured at the China plant has never been a topic of

conversation or any communication between Polymetrix and Chengold or Polymetrix and

Chemtex International.  (Müller Decl., ¶ 8) (Christel Decl., ¶ 11)  Polymetrix has

absolutely no knowledge regarding Chengold's intentions for the sale of PET

manufactured at the China plant after it commences commercial operation.  (Müller

Decl., ¶ 8) (Christel Decl., ¶ 11)

There are no EcoSphere™ process plants built or operating in the U.S.  (Müller

Decl., ¶ 9) (Christel Decl., ¶ 12)  Further, Polymetrix has no pending offers to supply

equipment, designs or engineering services to build an EcoSphere™ plant in the U.S. or

to retrofit an existing plant in the U.S. with the EcoSphere™ process.  (Müller Decl., ¶ 9)

(Christel Decl., ¶ 12)

In their Complaint GPT/DAK alleged:

> 19.    Upon information and belief, Defendant . . . has and continues to sell or offer for sale in the United States plants that use the EcoSphere™ process."  [Doc. No. 1, p. 6. ¶ 19]

> 20.    Upon information and belief, customers of Defendant . . . have and continue to import into the United States PET manufactured using Defendant's EcoSphere™ process. Such importation constitutes infringement under 35 U.S.C. § 271(g)."  [Doc. No. 1, p. 6. ¶ 20]

Despite general allegations of infringement based upon information and belief, GPT/DAK's Complaint contained no evidence or specific allegations of importation of PET from the Poland plant, presumably because GPT/DAK was unaware of the Poland plant at the time they filed the Complaint.  In addition, despite these general allegations, GPT/DAK's Complaint contained no evidence or specific allegations of importation of PET from the China plant, presumably because GPT/DAK knew at the time of the Complaint that the China plant was not in operation.  Finally, despite these general allegations, GPT/DAK's Complaint contained no specific allegations or evidence about an EcoSphere™ plant in the U.S. or any "offers" by Polymetrix to build an EcoSphere™ plant in the U.S. or retrofit an existing plant in the U.S. with the EcoSphere™ process, presumably because GPT/DAK was unaware that there were no EcoSphere™ plants in the U.S. at the time they filed the Complaint.  [Doc. No. 1]

Prior to filing the Complaint, Plaintiff DAK Americas, LLC ("DAK"), with two co-Petitioners, filed a petition with the U.S. International Trade Commission on March

10, 2015 seeking to impose antidumping ("AD") and countervailing ("CVD") duties on the importation of PET into the U.S. from China and several other countries.  The hearing on the petition was held on March 1, 2016 and the ITC's determination was issued on April 28, 2016.  (Noah Decl., Exhibit B)  The ITC determined that an industry in the United States was materially injured by reason of imports of certain PET resin from China, in addition to the other countries identified in the petition, and recommended the imposition of AD/CVD duties.  (Noah Decl., Exhibit B)  The final AD duty rate that would apply to Chengold if they ever were to export PET from the China plant to the U.S. is 125.75% and the final CVD rate is 27.55% .  Thus, the combined AD/CVD rate to be collected via duty deposits would be 125.75% + 27.55% = 153.30%.  (Noah Decl., Exhibit C)  All of this information was known to GPT/DAK prior to July 12, 2016, the date they filed the Complaint.

## III.   ARGUMENT

### A.   Legal Standard for Subject Matter Jurisdiction

Rule 12 of the Federal Rules of Civil Procedure provides that a party may move to dismiss a complaint for lack of subject matter jurisdiction.  Fed.R.Civ.P. 12(b)(1).  A district court may dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1) if the complaint is successfully challenged on its face or on the factual truthfulness of its averments.  *Osborn v. U.S.*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990).  In a factual challenge to subject matter jurisdiction, the Court may consider matters outside of the pleadings and the non-moving party does not have the

benefit of the safeguards of Fed.R.Civ. P. 12(b)(6), which is governed by Rule 56 when matters outside the pleadings are considered.  *Osborn*, 918 F.2d at 729.  Moreover, no presumptive truthfulness attaches to the plaintiff's allegations and the existence of disputed material facts will not preclude the court from evaluating for itself the merits of jurisdictional claims.  *Osborn*, 918 F.2d at 729, *citing Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.")

Not only may the lack of subject matter jurisdiction be raised at any point in the litigation, neither the court nor the parties may waive subject matter jurisdiction.  *United States v. Cotton*, 535 U.S. 625 (2002).  Once jurisdiction is challenged, the party asserting subject matter jurisdiction bears the burden of establishing that subject matter existed at the time the claim for relief was filed.  *Benitec Austl., Ltd. v. Nucleonics, Inc.,* 495 F.3d 1340, 1344 (Fed. Cir. 2007)

While GPT/DAK's Complaint is not styled as an action under the Declaratory Judgment Act, GPT/DAK is effectively seeking a declaratory judgment as a remedy, especially with respect to the Poland and China plants since there has been no importation of PET from either of these plants to date.  In that regard, the Court's authority to issue a declaratory judgment is governed in the first instance by the Declaratory Judgment Act, which, in relevant part, provides:

> In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  In other words, the Court must be presented an actual case or controversy in order issue declaratory relief.

It is important to keep in mind that the Declaratory Judgment Act creates a remedy, not an independent source of subject-matter jurisdiction.  *Sandoz Inc. v. Amgen Inc.*, 773 F.3d 1274, 1277 (Fed. Cir. 2014), *citing  Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).  Indeed, "[i]ts remedy may lie only if the court has jurisdiction from some other source." *Prasco, LLC v. Medicis Pharmaceutical Corp.,* 537 F.3d 1329, 1335 (Fed. Cir. 2008), *citing Cat Tech*, *LLC. V. TubeMaster, Inc.*, 528 F.3d 871, 879 (Fed. Cir. 2008).  The decision to entertain and grant a declaratory judgment is within the sound discretion of the district court, but only when there is an actual controversy and the court has jurisdiction.  *Cat Tech*, 528 F.3d at 883 ("When there is no actual controversy, the court has no discretion to decide the case.  When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary.") (citation omitted)

The phrase "case of actual controversy" refers to those "cases" and "controversies" that are justiciable under Article III of the Constitution.  "Article III limits federal jurisdiction to suits that address 'a real and substantial controversy ... as distinguished from an opinion advising what the law would be upon a hypothetical state

of facts.' " *Sierra Applied Scis., Inc. v. Advanced Energy Indus., Inc.*, 363 F.3d 1361, 1372 (Fed. Cir. 2004), *citing Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937).  *See also Flast v. Cohen*, 392 U.S. 83, 96 (1968) (remarking that "it is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions") (quotation and citation omitted).

The United States Supreme Court has established a baseline test for whether an Article III case or controversy exists, requiring a determination of "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 127 (2007) (internal quotations and citation omitted).  Such a controversy must be "definite and concrete," "real and substantial," and permit "a decree of a conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical state of facts." *Id.* at 127, *citing Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240-41 (1937).  *See also Sandoz*, 773 F.3d at 1277, *Sierra*, 363 F.3d at 1372; *Prasco,* 537 F.3d at 1335-36 and *Cat Tech*, 528 F.3d at 879.

Instead of a bright-line rule for determining whether an action satisfies the case or controversy requirement, "the analysis must be calibrated to the particular facts of each case," with the basic standard being whether "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Matthews Intern. Corp. v. Biosafe Engineering, LLC*, 695 F.3d

-15-

1322, 1328 (Fed. Cir. 2012), *quoting MedImmune*, 549 U.S. at 127. *See also Cat Tech*, 528 F.3d at 879 and *Prasco,* 537 F.3d at 1336.

Considering the Supreme Court's suggestion in *MedImmune* that "justiciability problem[s]" can be described in terms of standing and ripeness, the Federal Circuit has said that ripeness and standing, as well as mootness, serve as "helpful guide[s] in applying the all-the-circumstances test because satisfying these doctrines represents the absolute constitutional minimum for a justiciable controversy under Article III." *Sandoz*, 773 F.3d at 1278 (internal quotation marks omitted), *citing Prasco*, 537 F.3d at 1336 ("While [the *MedImmune*] standard can be analyzed directly, the Supreme Court has also developed various more specific but overlapping doctrines rooted in the same Article III inquiry that must be met for a controversy to be justiciable, including standing, ripeness, and a lack of mootness."), *citing Caraco Pharm. Labs., Ltd. v. Forest Labs., Inc.*, 527 F.3d 1278, 1291 (Fed. Cir. 2008).

Here, ripeness principles, in particular, reinforce the importance of contingency in the subject matter jurisdiction analysis. In that regard, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Sandoz*, 773 F.3d at 1278 (citation omitted). More broadly, a ripeness analysis considers whether "further factual development would significantly advance [the court's] ability to deal with the legal issues presented," and whether "the complained-of conduct has an 'immediate and substantial impact' on the plaintiff." *Sandoz*. 773 F.3d at 1278.

The "immediacy and reality" *MedImmune* inquiry can also be viewed through the lens of standing. "To satisfy standing, the plaintiff must allege (1) an injury-in-fact, i.e., a harm that is concrete and actual or imminent, not conjectural or hypothetical, (2) that is fairly traceable to the defendant's conduct, and (3) redressable by a favorable decision." *Prasco*, 537 F.3d at 1337, *quoting  Caraco*, 527 F.3d at 1291.

Regardless of whether the justiciability problem is labeled ripeness, standing, or the requirement that the controversy have "sufficient immediacy and reality," the underlying inquiry, rooted in the requirement that Article III courts cannot issue advisory opinions, remains the same, is there a "case of actual controversy." *Prasco*, 537 F.3d at 1338, n. 6, *citing MedImmune*, 549 U.S. at 128, n. 8. Indeed, the Federal Circuit has emphasized that *MedImmune* "did not change the bedrock rule that a case or controversy must be based on a *real* and *immediate* injury or threat of future injury that is *caused by the defendants*—an objective standard that cannot be met by a purely subjective or speculative fear of future harm." *Prasco,* 537 F.3d at 1339 (emphasis in original) Put another way, "a fear of future harm that is only subjective is not an injury or threat of injury caused by the defendant that can be the basis of an Article III case or controversy." *Id*. (citations omitted) Instead, "it is the *reality* of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Id.* (citations omitted)

Regarding the "immediacy" requirement, the Federal Circuit has assessed this requirement "by considering how far in the future the potential infringement is, whether the passage of time might eliminate or change any dispute, and how much if any harm the

potential infringer is experiencing, at the time of suit, that an adjudication might redress."
*See Sandoz,* 773 F.3d at 1278, *citing Matthews*, 695 F.3d at 1329-30 (citations omitted).

The Federal Circuit has found delays of several months or more between filing
and potential infringement to be too indefinite to justify subject matter jurisdiction.  For
example, in *Sierra*, the Court concluded that a dispute lacked the required immediacy
where a prototype of the product in question would not be operational until more than a
year after the complaint was filed.  *Sierra*, 363 F.3d at 1379.  Similarly, in *Lang v.
Pacific Marine & Supply Co.*, 895 F.2d 761 (Fed. Cir. 1990), the Federal Circuit affirmed
the dismissal of a suit seeking a declaratory judgment that a ship in the process of being
built would infringe, upon completion, certain hull-design patents. The Federal Circuit
concluded that immediacy was absent because the allegedly infringing activity would not
occur for at least nine months after the complaint was filed.

In *Telectronics Pacing Systems, Inc. v. Ventritex, Inc.*, 982 F.2d 1520, 1525-27
(Fed. Cir. 1992), the Federal Circuit affirmed the dismissal of a suit filed by a patent
holder seeking a declaratory judgment that a medical device would infringe upon its
approval by the Food and Drug Administration ("FDA").  The Court concluded that at
the commencement of the suit, the device had only recently begun clinical trials and was
therefore years away from potential FDA approval.

In *Matthews*, the Court found the dispute too speculative and remote to support the
exercise of jurisdiction where the plaintiff did not practice the method claimed in the
patents and there was no concrete evidence that its customers had planned to operate the
accused Bio Cremation™ equipment in a manner that could arguably infringe.

-18-

*Matthews*, 695 F.3d at 1328-29 ("Until some specific and concrete evidence regarding how Matthews' customers plan to use the cremation units is available, any judicial determination regarding whether such use would infringe the Method Patents would be premature."), *citing Sierra*, 363 F.3d at 1379.

In addition to the Federal Circuit cases discussed above, this Court has recently dismissed a declaratory judgment claim where "at the earliest, the prototype did not exist until at least nine months had passed after the date the declaratory judgment claim was filed.  Such a lengthy delay between the filing of the claim and the time when infringement became a possibility does not, in this Court's view, evidence sufficient immediacy to warrant the relief Defendants request."  *Luminara Worldwide, LLC v. Liown Electronics Co. Ltd.*, 2017 WL 1555881 at 10 (D. Minn. 2017) (Nelson, J.) ("Defendants' motion impermissibly seeks an advisory opinion as to whether its 'rotatably secured' design-around prototype infringes Luminara's '355 and '319 patents.")

In short, Courts, including this one, have focused on the related questions of timing ("immediacy") and contingency ("reality") regarding the existence and content of any needed patent adjudication, as well as the <u>current</u> concrete harms to the declaratory-judgment plaintiff from delaying an adjudication.  As set forth below, GPT/DAK has not experienced any harm and any future potential infringement is simply too speculative and hypothetical to establish a case or controversy under Article III that would warrant the Court's discretionary exercise of jurisdiction.

**B.**    **There is No Justiciable Controversy Under**
         **Article III Regarding the Poland and China Plants**

Since the Poland and China plants are located outside the U.S., the only legal basis for GPT/DAK to assert infringement of the patents-in-suit by Polymetrix in connection with these plants, and the only way the trier of fact could possibly find infringement would be if: 1) product manufactured by these plants was "made by a process patented in the United States" and imported into the U.S.; and 2) Polymetrix induced such importation.  35 U.S.C. § 271(g).  In other words, the "infringing act" under § 271(g) with respect to U.S. method patents is the importation of product made by the process, not the performance of the process steps.  Thus, without any importation, there can be no infringement liability under § 271(g) as a matter of law.

There has been no importation into the U.S. of PET manufactured at the Poland plant and the China plant was not in commercial operation at the time of GPT/DAK's Complaint.  And with the benefit of hindsight, it has been almost two years since GPT/DAK filed their Complaint and there has been no importation of PET into the U.S. from the Poland plant and the China plant is still not in commercial operation.  As a result, no case or controversy of sufficient "immediacy" or "reality" existed as of the day GPT/DAK filed their Complaint to create a justiciable controversy under Article III of the Constitution.  Nor is there a case or controversy today because nothing has changed in that regard during the 2 years following that date.

### 1.     The Poland Plant

This Court does not have subject matter jurisdiction with respect to the Poland plant.  As of July 12, 2016, the date GPT/DAK filed its Complaint, there had been no importation into the U.S. of PET manufactured at the Poland plant.  Today, almost two years after GPT/DAK filed their Complaint, there still has not been any importation into the U.S. of PET manufactured at the Poland plant.  In other words, the Poland EcoSphere™ plant has been in operation for 4 years and during that period of time there has been no exportation to the U.S. of any product made at that plant.  (*See, e.g.*, Noah Decl., ¶ 2, Exhibit A)

In addition, there is no evidence or reason to suggest that any product made at that plant will in the future be exported into the U.S.  It is pure speculation on GPT/DAK's part and correspondingly, GPT/DAK is simply asking the Court for an unconstitutional advisory opinion advising what would be based upon a hypothetical state of facts.  *See MedImmune*, 549 U.S. at 127; *Sandoz*, 773 F.3d at 1277, *Sierra*, 363 F.3d at 1372; *Prasco,* 537 F.3d at 1335-36.

Moreover, Polymetrix has engaged in no conduct in connection with the Poland plant to establish an "injury-in-fact" to GPT/DAK that would be redressable by this Court.  Polymetrix legally supplied equipment and engineering used in the construction of an EcoSphere™ plant in Poland.  The three U.S. patents that GPT/DAK asserted against Polymetrix in this case do not extend to the operation of the plant in Poland and can only be infringed if product made at that plant is imported into the U.S.  Further, there can be no dispute that Polymetrix would not be liable for that importation unless it

actively aided and abetted in such importation.   Because there has been no importation into the U.S. of PET manufactured at the Poland plant, Polymetrix's conduct in supplying equipment and engineering used in the construction of the Poland plant does not give rise to any liability under the U.S. patent laws.

In short, with the benefit of hindsight over the past approximate 2 years, the Court can unequivocally conclude that any dispute regarding the Poland plant lacked "immediacy and reality" at the time GPT/DAK filed their Complaint because there was no importation as of the date of the Complaint as well as the approximate 2 years since that date.  GPT/DAK's Complaint with respect to the Poland plant merely seeks an advisory opinion based upon a purely subjective and speculative fear of future harm that is based upon a hypothetical set of facts.

The Court should dismiss GPT/DAK's Complaint for lack of subject matter jurisdiction to the extent GPT/DAK seeks a ruling pertaining to the Poland plant.

### 2.      The China Plant

This Court does not have subject matter jurisdiction with respect to the China plant.  It is indisputable that as of July 12, 2016, the China plant was not operational.  It is also undisputable that today, almost two years after GPT/DAK filed their Complaint, the China plant is still not operational.  In fact, the China plant was not even completed mechanically and electrically until at least mid-2017, almost 1 year <u>after</u> GPT/DAK filed their Complaint.  (Müller Decl., ¶ 7) (Christel Decl., ¶ 10)

Even more troubling than GPT/DAK's knowledge of the status of the China plant at the time they filed their Complaint is that GPT/DAK themselves created the scenario,

which makes this speculative future harm and hypothetical set of facts even more unreal and unlikely.  Indeed, GPT/DAK has done everything they possibly could outside of this lawsuit to effectively prevent PET manufactured at the China plant from being exported to the U.S. in the future.  More specifically, in April, 2016 GPT/DAK obtained a decision from the U.S. ITC imposing 153.3% antidumping/countervailing duties on PET imports from China, among other countries.  (Noah Decl., Exhibits A-C)

Given these usurious duties, it does not take a leap of faith to conclude that the likelihood of any exportation of PET made at the China plant is slim to none.  As a result of the ITC's determination, any importer of PET from China will be required to make AD/CVD duty deposits to the U.S. Customs and Border Protection agency of 153.3%. To understand the impact of these AD/CVD duties, assume, for purposes of discussion, a U.S. domestic price per ton of PET at $1,000 and that China undersells this price by 25%. In this scenario, excluding shipping costs (because the importer would have to pay U.S. shipping costs for domestically produced product as well), the final PET price per ton from China that the importer would have to pay is: $750 (25% discounted price per ton) + $48.75 (normal duty of 6.5%) + $1,149.75 AD/CVD deposits (153.3% AD/CVD duties) = $1,948.50 per ton.  Thus, any importer that would want to import PET from the China plant in the future would have to pay $1,948.50 per ton versus the $1,000 per ton for domestic product.  Given that the Department of Commerce requires a Certificate of Non-Reimbursement so that the importer cannot be reimbursed by the exporter for the AD/CVD deposits, 19 C.F.R. § 353.26, the importer would have to pay $948.50 more per ton for PET imported into the U.S. from China as a result of the AD/CVD duties that

GPT/DAK successfully got the ITC to impose.  This amounts to a cost of 94.85% more than domestically produced PET.  Simple logic suggests that an importer is not going to import PET from China and pay a 94.85% premium.

But the Court does not need to speculate as to what could happen with product manufactured at the China plant.  The point Polymetrix is making here is that GPT/DAK themselves created a situation where it is extremely unlikely that PET from the China plant will be exported into the U.S. after the China plant commences operation.  After all, if GPT/DAK did not believe that the antidumping/countervailing duties would be effective in stopping exports from China, why would they gone through the trouble and expense of the ITC proceeding?  This unlikelihood was known to GPT/DAK at the time they filed their Complaint on July 12, 2016.

In short, the only conduct "traceable" to Polymetrix here is that it supplied equipment and engineering used in the construction of the China plant, which, again, under the U.S. patent laws it is legally entitled to do without giving rise to any liability.  There is simply no justiciable case or controversy with respect to the China plant.  GPT/DAK's claim is not ripe for adjudication because it is based upon future events that may not occur at all.  *Sandoz*, 773. F.3d at 1278; *Prasco*, 537 F.3d at 1338-39 ("it is the *reality* of the threat of . . . injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions")(emphasis in original, citations omitted)

More importantly, GPT/DAK's subjective fear of future harm is not a harm that has been or will be caused by Polymetrix.  Polymetrix cannot import any PET manufactured at the China plant since it does not own or operate the China plant.  (Müller

Decl., ¶ 6) (Christel Decl., ¶ 8)  Indeed, Polymetrix does not manufacture, sell, export or import PET anywhere in the world.  (Müller Decl., ¶ 2)

Polymetrix anticipates that GPT/DAK will rely on an old news posting from Polymetrix's website dated August 7, 2015 indicating that the China plant was scheduled to be commissioned in the second quarter of 2016 to support an argument that at the time of the Complaint, a "real" and "immediate" controversy existed regarding the China plant.  (Noah Decl., ¶ 6, Exhibit E)  This reliance is misplaced for several reasons.

First, the news release was posted almost one year before GPT/DAK filed their Complaint and there have been no subsequent news postings updating the progress of the China plant on Polymetrix's website.  The lack of any subsequent news releases about the progress of the China plant renders this posting of little to no value and begs the question did GPT/DAK do any further investigation before filing the Complaint to determine whether the China plant was in fact "commissioned" in Q2 2016 in view of this news release.  Certainly, if they did they would have learned that it was not.   (Müller Decl., ¶ 7) (Christel Decl., ¶ 10)

Second, the posting indicated that the China plant was "scheduled to be commissioned in the second quarter of 2016."  (Noah Decl., ¶ 6, Exhibit E)  GPT/DAK filed their Complaint two weeks after the close of Q2 2016 and, according to the news release, two weeks after the China plant was "scheduled to be commissioned."  Once again, it begs the question did GPT/DAK do any further investigation before filing the Complaint to determine whether the China plant was in fact "commissioned" in Q2

2016?  Certainly, if they did they would have learned that it was not.   (Müller Decl., ¶ 7)

(Christel Decl., ¶ 10)

Third, the China plant was not in fact pre-conditioned/commissioned until mid-

2017 and regardless, "commissioning" a plant does not mean that the plant is ready for

commercial operation.  (Müller Decl., ¶ 7) (Christel Decl., ¶ 10)   The China plant is still

not in commercial operation nearly 2 years after GPT/DAK filed their Complaint.   *Id*.

Fourth, even if the China plant was pre-conditioned/commissioned before the end

of Q2 2016 and commercial production began thereafter, this does not transform the

alleged dispute regarding the China plant into a controversy that was "immediate" and

"real" because it still does not establish whether the exportation of PET into the U.S.

from the China plant at the time of the Complaint was imminent and not simply

speculative and hypothetical future harm.

Fifth, in April 2016 (Q2 2016), GPT/DAK had successfully obtained a decision

from the U.S. ITC imposing 153.3% AD/CVD duties on PET imports from China, among

other countries, which makes this speculative future harm and hypothetical set of facts

even more unreal and unlikely at the time of the Complaint.  (Noah Decl., Exhibits A-C)

In summary, like the Poland plant, with the benefit of hindsight over the past

approximate 2 years, the Court can unequivocally conclude that any dispute regarding the

China plant lacked "immediacy and reality" at the time GPT/DAK filed their Complaint.

The China plant was not in commercial operation as of the date GPT/DAK filed their

Complaint, nor is it in commercial operation today nearly two years later.  Simply put,

GPT/DAK cannot represent to this Court that the China plant had an immediate and real

impact on July 12, 2016 when they filed their Complaint.  In a nutshell, GPT/DAK's

Complaint with respect to the China plant merely seeks an advisory opinion based upon a

purely subjective and speculative fear of future harm that is based upon a hypothetical set

of facts.

The Court should dismiss GPT/DAK's Complaint for lack of subject matter

jurisdiction to the extent GPT/DAK seeks a ruling pertaining to the China plant.

C.    **There is no Justiciable Case or Controversy Over**
      **Unaccepted "Offers to sell" Equipment and**
      **Engineering for an EcoSphere™ Process in the U.S.**

This Court also does not have subject matter jurisdiction with respect to any offers

Polymetrix may have made to supply equipment, designs or engineering services to either

build an EcoSphere™ plant in the U.S. or to retrofit an existing PET manufacturing plant

in the U.S.  There is no dispute that there are no EcoSphere™ plants built or operating in

the U.S.  (Müller Decl., ¶ 9) (Christel Decl., ¶ 12)  Thus, any such offers that Polymetrix

may have made in the past were indisputably not accepted.  Further, Polymetrix has no

pending offers to customers to supply equipment, designs or engineering services to

either build an EcoSphere™ plant in the U.S. or to retrofit an existing PET manufacturing

plant in the U.S.  (Müller Decl., ¶ 9) (Christel Decl., ¶ 12)

Given these indisputable facts, there can be no justiciable controversy over

unaccepted "offers to sell" that Polymetrix may have made.  It is well settled that the sale

of equipment to perform a process is not a sale of the process within the meaning of 35

U.S.C. § 271(a) because a method or process claim is only infringed when the process is

performed.  *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993) ("The

law is unequivocal that the sale of equipment to perform a process is not a sale of the process within the meaning of section 271(a).") *See also*, *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1318-21 (Fed. Cir. 2005) and *Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1334-35 (Fed. Cir. 2008).

In *Joy Technologies*, the defendant was in the business of designing and building flue gas desulfurization (FGD) plants throughout the United States for use in conjunction with industrial plants, such as power plants for production of electricity.  The patentee argued that the making or selling of an industrial plant designed to enable use of the patented system constituted a sale of the process claimed in the patent within the meaning of section 271(a).  *Joy Technologies*, 6 F.3d at 773.  The Federal Circuit disagreed and concluded that an injunction restraining the defendant from contracting to build or actually build a plant capable of performing the patented process cannot be justified on the ground that sale of the plant or equipment would directly infringe the method claims of the patent.  *Id*. at 774-75 ("a method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method. The sale of the apparatus is not a sale of the method.  A method claim is *directly* infringed only by one practicing the patented method.")

In *Ricoh*, the patentee accused the defendant of directly infringing the patents-in-suit through the sale or offer for sale of software that caused the accused disc drives to perform the claimed methods.  The Federal Circuit concluded that it was the actual carrying out of the software instructions that constituted a process within the meaning of § 271(a) and because the allegedly infringing sale was the sale of software (i.e.,

instructions to perform a process rather than the performance of the process itself), the Court found that there was no infringement. *Ricoh*, 550 F.3d at 1335 ("Accordingly, we hold that a party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a).")

It is important to note that the Federal Circuit in *NTP* and *Ricoh* did not expressly decide the issue of whether a method claim may be infringed under the "sells" and "offers to sell" prongs of 35 U.S.C. § 271(a). *See, e.g.*, *Ricoh*, 550 F.3d at 1335 ("However, because the allegedly infringing sale in this case was the sale of software (i.e., instructions to perform a process rather than the performance of the process itself), we need not determine whether a process may ever be sold so as to give rise to liability under § 271(a).") *NTP*, 418 F.3d at 1320-21 ("We need not and do not hold that method claims may not be infringed under the "sells" and "offers to sell" prongs of section 271(a).") But this does not change the result here. Just like the Federal Circuit did not have to reach the question whether method claims can be infringed under the "sells" or "offers to sell" prongs of section 271(a), neither does this Court.

All of the patents-in-suit include method claims only. It is indisputable that, similar to the defendant in *Joy Technologies*, Polymetrix sells equipment and engineering services used in the construction of an EcoSphere™ process plant. (Müller Decl., ¶ 2) Polymetrix's customers perform the EcoSphere™ process, not Polymetrix. (*Id.*) Even though not expressly decided by the *NTP* and *Ricoh* Courts, this is not a situation where Polymetrix would be offering to perform the process or methods claimed in the patents-in-suit. In other words, Polymetrix would not be offering to manufacture PET for its

potential customers since Polymetrix is not a manufacturer.  (*Id.*)  Any "offers for sale"

by Polymetrix, therefore, necessarily would not involve the offer for sale of a "process"

within the meaning of § 271(a) and could not, as a matter of law, constitute direct

infringement of GPT/DAK's method patents that are at issue in this case.  Further, since

any "offers for sale" were clearly not accepted, Polymetrix could not, as a matter of law,

ever be found to be liable under 35 U.S.C. §§ 271(b) or (c) because there was no direct

infringement under 35 U.S.C. § 271(a).  No EcoSphere plant was ever built in the U.S.

(Müller Decl., ¶ 9) (Christel Decl., ¶ 12)

Because any offers by Polymetrix to supply equipment, designs or engineering

services to build an EcoSphere™ plant in the U.S. or to retrofit an existing PET

manufacturing plant in the U.S. could not, as a matter of law, constitute an "infringing

offer to sell" within the meaning of 35 U.S.C. § 271(a), there was no case or controversy

with respect to any such offers at the time GPT/DAK filed their Complaint.  *See*, *e.g.*,

*Matthews*, 695 F.3d at 1329 and *Benitec*, 495 F.3d at 1348.  GPT/DAK cannot meet its

burden of showing that at the time they filed the Complaint on July 12, 2016, Polymetrix

had engaged in any activity could subject it to a claim of direct infringement based upon

unaccepted "offers to sell."  Correspondingly, GPT/DAK cannot meet the requirements

necessary to support a justiciable controversy.

The Court should dismiss GPT/DAK's Complaint for lack of subject matter

jurisdiction to the extent GPT/DAK seeks a ruling pertaining to any offers Polymetrix

may have made to supply equipment, designs or engineering services to either build an

EcoSphere™ plant in the U.S. or to retrofit an existing PET manufacturing plant in the U.S.

### D.     No Injunctive Relief Available to GPT/DAK

Even if GPT/DAK could establish an "injury-in-fact" that is "fairly traceable" to Polymetrix's conduct in connection with the Poland and China plants, this "injury" is not redressable by a favorable decision of the Court.  First, because there has been no importation from the Poland plant and/or the China plant, and because any unaccepted "offers for sale" do not constitute an infringement, there will be no damages suffered by GPT/DAK.  This leaves injunctive relief as GPT/DAK's only potential remedy.  Thus, assuming for argument sake that GPT/DAK's subjective fear of the speculative and hypothetical importation of PET into the U.S. made at the Poland or China plants created a justiciable case or controversy, the Court is without power to prevent that importation through injunctive relief.

The Supreme Court has long held that "courts may not grant an injunction so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law."  *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9, 13 (1945).  *See also Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352,1365-66 (Fed. Cir. 2017)  Indeed, Fed.R.Civ.P. 65(d)(2) provides that an injunction is binding only upon the parties to the action their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

At best, the Court can only issue an injunction preventing Polymetrix (and those in active concert or participation), from not doing what Polymetrix already does not do, and that is export, or aid and abet any entity in exporting, PET into the U.S. made at the Poland or China plants.  (Müller Decl., ¶ 2)  The Court has no subject matter jurisdiction, let alone personal jurisdiction, over the purported hypothetical "exporters," i.e., the independent owners of the Poland and China plants (or any entity that these owners may use to sell PET around the world), because these independent entities are not exporting PET from these plants into the U.S.  In other words, the rights of these independent third parties will not be adjudicated in this case.  So even if the owners of the Poland and China plants did have future intentions to export PET to the U.S., the Court could not prevent that importation with any injunction that it could legally issue against Polymetrix under Fed.R.Civ.P. 65 (d)(2) in the present case.  The reasons are clear: the Poland and China plant owners are not "in active concert or participation with" Polymetrix with respect to importation and Polymetrix has no control over these independent entities. (Müller Decl., ¶¶ 3-6 and 8)

In short, the Court's injunction could not reach these plant owners, or any entity that either of these plant owners would potentially use in the future to import PET into the U.S. from these plants.  Accordingly, even if GT/DAK could establish that they did suffer an "injury-in-fact" as a result of this speculative and hypothetical future importation, this "injury" would not be "redressable by a favorable decision" in this case. *Prasco*, 537 F.3d at 1338, *citing Caraco*, 527 F.3d at 1291.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Polymetrix this Court should grant Polymetrix's motion under Fed.R.Civ.P. 12(b)(1) and dismiss GPT/DAK's Complaint in its entirety for lack of subject matter jurisdiction.

Dated:  March 7, 2018                    Respectfully Submitted,

DERGOSITS & NOAH LLP


By:   /s/ Todd A. Noah
        Todd A. Noah (*Pro Hac Vice*)
        Igor Shoiket (*Pro Hac Vice*)
        Stephen H. Youtsey (*Pro Hac Vice*)
        One Embarcadero Center, Suite 350
        San Francisco, CA  94111
        (415) 705-6377
        tnoah@dergnoah.com



FAEGRE BAKER DANIELS LLP
Theodore M. Budd, MN Bar No. 314778
Timothy M. Sullivan, MN Bar No. 391528
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
ted.budd@faegrebd.com

Attorneys for POLYMETRIX AG