# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Grupo Petrotemex, S.A. DE C.V., and DAK Americas, LLC,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Polymetrix AG,<br><br>　　　　　Defendant. | Case No. 16-cv-2401 (SRN/HB)<br><br>**MEMORANDUM OPINION AND ORDER**<br><br>~~**FILED UNDER SEAL**~~<br><br>REDACTED as authorized by the Court, March 15, 2019 |

Eric W. Schweibenz, John F. Presper, J. Derek Mason, and Robert S. Mattson, Oblon, McClelland, Maier & Neustadt, LLP, 1940 Duke Street, Alexandria, VA 22314, and Barbara J. D'Aquila, Margaret Rudolph, and Laura J. Borst, Norton Rose Fulbright US LLP, 60 South Sixth Street, Suite 3100, Minneapolis, MN 55402 for Plaintiffs.

Todd A. Noah, Stephen H. Youtsey, and Igor Shoiket, Dergosits & Noah LLP, One Embarcadero Center, Suite 350, San Francisco, CA 94111, and Bernard E. Nodzon, Jr., Theodore M. Budd, and Timothy M. Sullivan, Faegre Baker Daniels LLP, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402 for Defendant.

SUSAN RICHARD NELSON, United States District Judge[1]

　　This is a multi-continent patent infringement litigation between two companies involved in the manufacture of "polyethylene terephthalate," or "PET," which is used to create plastic bottles and containers. In July 2016, Plaintiffs Grupo Petrotemex, S.A. DE C.V., a Mexican company, and DAK Americas, LLC, its American affiliate (collectively, "GPT/DAK"), filed a complaint accusing Defendant Polymetrix AG, a Swiss company,

---

[1] The Court is in receipt of GPT/DAK's March 4, 2019 letter requesting leave to file additional evidence received through the Hague Convention discovery process. (*See* Doc. No. 407.) In light of this Order, GPT/DAK's request is denied as moot.

of selling foreign PET manufacturers a technical process that infringed three of GPT/DAK's U.S. patents and then inducing those manufacturers to export the resulting PET to the United States, in violation of U.S. patent law. Polymetrix adamantly denies these claims. The case slowly proceeded through discovery throughout 2016 and 2017, punctuated by various disputes over the scope of GPT/DAK's discovery into Polymetrix's foreign clients.

However, in March 2018, Polymetrix brought an even more fundamental issue to the Court's attention: whether an actual "case or controversy" even existed under Article III, such that this Court could lawfully exercise jurisdiction over the litigation. Specifically, Polymetrix moved to dismiss GPT/DAK's complaint under Fed. R. Civ. P. 12(b)(1), and argued that, because no evidence existed showing that PET produced using the at-issue process had ever entered the United States, much less with Polymetrix's knowledge or approval, GPT/DAK was essentially litigating a future, speculative worry, rather than an "actual" and "concrete" "injury in fact" that was "fairly traceable" to Polymetrix. *See Spokeo v. Robins*, 136 S. Ct. 1540, 1548 (2016). GPT/DAK riposted that this motion was procedurally improper, because Federal Circuit law holds that "importation" is a merits question, rather than a jurisdictional concern, *see Litecubes, LLC v. Northern Light Products, Inc.*, 523 F.3d 1353 (Fed. Cir. 2008), and that, in any event, at least a few shipments of PET manufactured at a Polish plant, using Polymetrix's allegedly infringing process, entered the United States in 2016, and thus injured GPT/DAK.

At the June 2018 motion hearing, the Court noted the paucity of evidence in support of an "injury" that was "fairly traceable" to Polymetrix, even under the Federal Circuit's lenient Article III standing requirements for patent infringement plaintiffs. The Court also expressed concern about continuing this expensive, protracted international patent litigation based on mere hypothetical fears. Accordingly, the Court ordered the parties to engage in 90 days of focused, jurisdictional discovery to determine if evidence existed from which GPT/DAK could prove "injury in fact" and "causation" under Article III. Following that 90-day discovery period, and additional briefing, the Court held two evidentiary hearings, first on January 8, 2019, and then again on January 22, 2019.

After carefully reviewing the evidence submitted by the parties, both at the hearings and in the parties' supplemental submissions (including the relevant deposition transcripts), the Court has now satisfied itself that an actual "case or controversy" exists here, such that the Court may exercise Article III jurisdiction over this action. Whether GPT/DAK's claims could survive a properly-placed Rule 56 motion remains a question for a future date. The Court explains its reasoning at greater length below.[2]

I. DISCUSSION

A. The Law

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const., art. III, § 2, cl. 1. Accordingly, any federal

---

[2] The Court also considered GPT/DAK's February 25, 2019 "motion to strike improper argument from [Polymetrix's] post-hearing reply brief." (Doc. No. 399.) In light of this ruling, the Court denies that motion as moot.

court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, a plaintiff must show "(1) [that he] suffered an 'injury in fact' . . . which is . . . 'actual or imminent, not conjectural or hypothetical'; (2) [that there is a] causal connection between the injury and the conduct complained of [that is] 'fairly traceable to the challenged action of the defendant'; and (3) that '[it is] likely, as opposed to merely speculative, that the injury will be 'redressed by a favorable decision.'" *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1377 (Fed. Cir. 2012) (cleaned up) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Similarly, a dispute must be "ripe for adjudication," and must not "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Sandoz, Inc. v. Amgen, Inc.*, 773 F.3d 1274, 1278 (Fed. Cir. 2014) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)); *see also id*. (observing that "standing" and "ripeness" are both "helpful guides" in determining whether a plaintiff has satisfied "the absolute constitutional minimum for a justiciable controversy under Article III"). These constitutional doctrines exist to prevent federal courts from "issuing advisory opinions based upon hypothetical facts." *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1338 (Fed. Cir. 2007); *accord Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning.").

As such, "[i]t is well-established that any party, and even the court *sua sponte,* can raise the issue of standing for the first time at any stage of the litigation." *Pandrol USA, LP v. Airboss Ry. Products, Inc.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003). If subject matter

4

jurisdiction, either through standing, ripeness, or some other doctrine, is found lacking, "the Court has no authority to go further than dismissing the case." *Shoots v. iQor Holdings US, Inc.*, No. 15-cv-563 (SRN/SER), 2016 WL 6090723, at *2 (D. Minn. Oct. 18, 2016) (citing *Ex Parte McCardle*, 74 U.S. 506, 514 (1868)).

Admittedly, in the patent law context, Article III standing is seldom challenged. This is likely because the Federal Circuit holds that a "'[c]onstitutional injury in fact' occurs when a party infringes a patent in violation of a party's exclusionary rights." *Drone Tech., Inc. v. Parrot, S.A.*, 838 F.3d 1283, 1292 (Fed. Cir. 2016) (quoting *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339-40 (Fed. Cir. 2007)); *accord Pandrol*, 320 F.3d at 1368 ("Establishing ownership of a patent that has been infringed satisfies the requirements of Article III standing."). In other words, the case law appears to suggest, so long as a patent holder alleges that they own a patent, and that another party is actively infringing that patent, a federal court can exercise subject matter jurisdiction over that dispute.

What is more, this lenient understanding of jurisdiction appears to apply even if virtually all of the allegedly infringing behavior occurred overseas. According to the Federal Circuit, because the question of "whether [] allegedly infringing act[s] happened in the United States is an *element* of the claim for patent infringement, *not* a prerequisite for subject matter jurisdiction," "[t]here [is] no need for [] district court[s] to consider whether [foreign defendants have] imported products into the United States in order to determine whether [they have] jurisdiction over [a] case." *Litecubes*, 523 F.3d at 1366 (emphasis added). Rather, any dispute over "importation," or other extraterritorial

5

conduct, must be resolved "in a Rule 12(b)(6) motion to dismiss for failure to state a claim or in a motion for summary judgment." *Id*. at n.14.[3]

All of that said, the Federal Circuit has never held that, in the face of facts suggesting that a foreign defendant has not *at all* harmed a U.S. patent holder under the U.S. patent laws, a federal court should not consider whether it may exercise Article III jurisdiction over the dispute. *Cf. Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) ("The ultimate responsibility of the federal courts, at all levels, is to reach the correct judgment under law. Though that obligation may be tempered at times by concerns of finality and judicial economy, nowhere is it greater and more unflagging than in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority."). Such a jurisdictional inquiry seems especially prudent when the facts suggest problems with both "standing" *and* "ripeness." *See, e.g.*, *Sandoz*, 773 F.3d at 1278; *Teva Pharm*., 482 F.3d at 1337-38.

The Court finds that it is faced with such a unique set of facts here, in that GPT/DAK's infringement case appears to be potentially premature *and* based on the "independent actions" of foreign actors "not before the court." *Lujan*, 504 U.S. at 560. Accordingly, lenient Federal Circuit law notwithstanding, the Court is dutybound to

---

[3] Of course, federal courts cannot exercise *personal* jurisdiction over an alleged foreign infringer unless that entity has at least some connection to the United States. *See generally Daimler AG v. Bauman*, 571 U.S. 117 (2014); *accord Litecubes*, 523 F.3d at 1365 (citing *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1569-72 (Fed. Cir. 1994)). But that question is not at issue here. (*See* Rule 26(f) Rep. [Doc. No. 54] at 2 ("[I]t is agreed that this Court has personal jurisdiction over the parties and that venue in this Court is proper.").)

undertake a standing analysis here. Moreover, because the Court construes Polymetrix's Fed. R. Civ. P. 12(b)(1) motion as a "factual attack" on GPT/DAK's standing, the Court will not accept the allegations in GPT/DAK's complaint as true, and will instead independently review the facts to determine whether GPT/DAK has proven standing by a preponderance of the evidence. *See Shoshone Indian Tribe v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). "In resolving these disputed predicate jurisdictional facts," the Court will "review evidence extrinsic to the pleadings," including all the evidence submitted by GPT/DAK during and after the evidentiary hearings. *Id.*; *accord Sandusky Wellness Ctr., LLC v. MedTox Sci., Inc.*, 250 F. Supp. 3d 354, 257 (D. Minn. 2017) ("When addressing a factual attack [to subject matter jurisdiction], a court may consider matters outside of the pleadings and weigh the evidence.").[4]

However, in accordance with binding Federal Circuit precedent, the Court will take care to *not* rule on the merits of GPT/DAK's suit, *i.e.*, whether GPT/DAK has proven by a preponderance of the evidence that PET made using the (allegedly) infringing process was imported into the United States, and, if so, whether Polymetrix

---

[4] The Court acknowledges the parties' dispute over whether, and to what extent, the Court may consider hearsay evidence in resolving a question of Article III standing. However, because this particular standing challenge is *sui generis* (indeed, neither side cites a 12(b)(1) factual attack bearing any resemblance to this one), and because a "district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," the Court will simply review all of the evidence and reach its own credibility determinations as needed. *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *accord APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (citing this language, and holding that a district court "acted within its discretion in relying on the whole record before [it] to make factual findings with respect to [subject matter] jurisdiction").

7

knowingly induced its clients (or other downstream entities) to engage in such importation. *See* 35 U.S.C. §§ 271(b),(g). For obvious reasons, the Court cannot require a plaintiff to prove its entire case in response to a jurisdictional challenge. *See Litecubes*, 523 F.3d at 1360-61 ("Subject matter jurisdiction does not fail simply because the plaintiff might be unable to ultimately succeed on the merits"; rather, "a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction."); *accord Am. Farm Bureau Fed'n v. U.S. Envtl. Prot. Agency*, 836 F.3d 963, 968 (8th Cir. 2016) ("The standing inquiry is not, however, an assessment of the merits of a plaintiff's claim. In assessing a plaintiff's Article III standing, we must assume that on the merits the plaintiffs would be successful in their claims."). This is especially so when a plaintiff has not completed discovery on the merits of their claim, like GPT/DAK here. (*See* June 28, 2018 Discovery Order [Doc. No. 210] (holding both discovery and GPT/DAK's then-pending "Second Motion to Compel" in abeyance pending this decision, with a limited exception for the "jurisdiction discovery" discussed herein).)

Rather, the question will simply be whether GPT/DAK has met its burden of proof under the *Lujan* factors, such that the Court can feel confident that this dispute is not "based upon hypothetical facts" of infringement, inducement, and importation. *Teva Pharm.*, 482 F.3d at 1338.

### B. GPT/DAK's Evidence in Support of Subject Matter Jurisdiction

The Court will now recite the facts GPT/DAK set forth in support of this patent infringement dispute being an actual, rather than hypothetical or speculative, "controversy" under Article III:

***First***, GPT/DAK owns the three at-issue patents, and it accuses Polymetrix of infringing these patents through its "PET SSP [Solid State Polymerization] EcoSphere with melt-to-pellet crystallization process" (hereinafter "EcoSphere"), which produces "bottle grade virgin PET." (*See* Pls.' Ex. 20-22 (exemplary claim charts); *see also* Pls.' Ex. 17-18 (Polymetrix promotional materials describing EcoSphere).) [5] GPT/DAK also contends that Polymetrix's "EcoBlend" process, which produces a "blend" of "recycled PET" and "virgin PET," infringes the three at-issue patents. (*See* Pls.' Ex. 32-34 (exemplary claim charts); *see also* Pls.' Ex. 19 at 19-25 (Polymetrix PowerPoint presentation describing EcoBlend technology).)[6]

It is not disputed that Polymetrix has known of one of GPT/DAK's patents since at least December 2015 (the '840 patent), and the other two since at least July 2016 (the '125 and the '545 patents). (*See* Pls. Ex. 105; Christel Dep. [Ex. No. 118] at 65-68.)

***Second***, GPT/DAK purchased the at-issue patents from a company called "Eastman" in late December 2011, and, in so doing, outbid a Thai company called

---

[5] When referencing evidence, the Court will cite to the exhibit numbers listed in the parties' jointly-submitted exhibit list, all of which were introduced and admitted into evidence during the January 8 and January 22 hearings. (*See* Doc. Nos. 386, 389.)

[6] Admittedly, GPT/DAK did not introduce any evidence related to the Eco*Blend* process, other than to argue that it, too, infringes GPT/DAK's patents. As such, the Court will not discuss the EcoBlend process any further, and will focus solely on the Eco*Sphere* process.

"Indorama." (Jan. 8, 2019 Hr'g Tr. [Doc. No. 383] at 91-92 (Hernandez).) Eastman and Indorama were involved in (eventually settled) patent litigation over PET patents at the time of the sale. (*Id.*)

***Third***, in October 2012, Polymetrix's predecessor company, Buhler Thermal Processes AG, "offered to sell PET technology" to ███████████████, by way of a highly-detailed offer to construct a PET plant in ███████████. (*See* Pls.' Ex. 8 at 21 (Polymetrix's responses to GPT/DAK's RFAs) ("RFAs"); *see also* Pls.' Ex. 14 (the 99-page 2012 offer-for-sale); Hendley Dep. [Ex. No. 116] at 95-98, 130-31).) In this offer, Buhler touted its PET technologies as ███████████████ ███████████████████████████████████ (Pl.'s Ex. 14 at 0-2.) Although this sale was never consummated (*see* Christel Dep. at 208), GPT/DAK argues that this interaction, ███████████████ ██████, shows that Polymetrix knew about ███████████████ (GPT/DAK Supp. Br. [Doc. No. 392] at 10-11.)

***Fourth***, ███████████████████████████████████ Polymetrix's CEO, Mr. Martin Muller, "entered into a contract in 2013 to revamp a PET plan located in Wloclawek, Poland for Indorama Ventures Poland Sp. Z.O.O," using the EcoSphere technology (hereinafter the "Indorama Poland plant"). (*See* RFAs at 5; Muller Dep. [Ex. No. 117] 17-18, 62-64, 68; Hendley Dep. at 95-98, 130-31.) This plant has been running the EcoSphere process since 2014. (*See* RFAs at 5.) Polymetrix has occasionally provided technical support for the plant, as well as conducted at least one

10

site visit with its Board of Directors. (*See* RFAs at 7; Muller Dep. at 73-76; Christel Dep. at 37-39.)

*Fifth*, on its website and in marketing presentations, Polymetrix touts its "virgin PET" as compatible with "PET bottles for all major beverage brand owners," and in compliance "with all national and regional food packaging regulations, such as those of the FDA." (Pls.' Ex. 24 (excerpt from website); *accord* Pls.' Ex. 25-27 (same); *see also* Pls.' Ex. 18 (describing EcoSphere as a "bottle grade virgin PET production technology").) According to GPT/DAK's expert Dr. Schiraldi, these references to "FDA compliance" matter for GPT/DAK's case because they suggest to producers of PET made using EcoSphere technology, like Indorama Poland, "you are safe to make a product [with this technology] to sell into the United States for food contract applications." (Jan. 8, 2019 Hr'g Tr. [Doc. No. 383] at 156; *id.* at 132 (approving Dr. Schiraldi as a "qualified expert in the chemical and polymer field, in particular as it relates to the PET industry").) Indeed, Indorama Poland likewise touts the virgin PET produced at its plant (called "Ramapet N1S") as "safe for food packaging applications based upon compliance with FDA regulation[s]." (Pls.' Ex. 29-30.) Although one of Polymetrix's senior executives, Mr. Andreas Christel, testified that Polymetrix and Indorama never had conversations about whether PET made using the EcoSphere process would be FDA-compliant (Christel Dep. at 82, 205), he also conceded that expressions of "FDA acceptance" are of "interest to [Polymetrix's] customers," and are a "selling point, maybe." (*Id.* at 102.)

*Sixth*, Polymetrix senior executives admitted that Polymetrix did not try to discourage Indorama Poland from importing PET produced using EcoSphere into the

11

United States. (*See, e.g.*, Christel Dep. at 73, 164; *accord* RFAs at 15 (conceding that Polymetrix "did not place any geographic restrictions on the sale of PET made by" the Indorama Poland plant).) At his deposition, Mr. Muller also agreed that Polymetrix, as an "equipment vendor," does "not want to know what Polymetrix customers do in terms of importing [PET] into the United States," and that Polymetrix has an "explicit understanding" with its customers to this effect. (Muller Dep. at 55-56.)

This "explicit understanding" arguably matters because the United States is the world's "second largest marketplace for polyester food packaging," and thus, according to Dr. Schiraldi, PET producers "absolutely want to be able to sell into" the United States; indeed, he added, "it would be hard to keep material out of this market." (*See* Jan. 8 Hr'g Tr. at 157.)

***Seventh***, beyond this evidence (which, GPT-DAK argues, strongly suggests Polymetrix knew that PET produced at the Indorama Poland plant would eventually enter the United States, potentially in violation of U.S. patent law), U.S. Customs and Border Control data show that, ███████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ (*See* Pls.' Ex. 36 (CBP data); *accord* Pls.' Ex. 2 (DataMyne report corroborating the CBP data, describing the three shipments as "bottle grade," "packaging grade" PET, and listing the likely value of these shipments as approximately $45,000).) This CPB data arguably matters because, according to two other business research reports, the Indorama Poland plant is the only producer of this kind of "virgin" PET in Poland. (*See* Pls.' Ex. 1 (Wood MacKenzie

report); Pls.' Ex. 5 (Global Data report).) Therefore, Dr. Schiraldi contended at the hearing, the Indorama Poland plant (and the allegedly infringing EcoSphere process, in particular) constituted the most likely source of ███████'s PET. (*See* Jan. 22, 2019 Hr'g Tr. [Doc. No. 388] at 28 (explaining why it would not be cost-effective for a non-Polish European PET producer to ship PET to Poland, only to have the Polish company send the PET to the U.S. by air).) At the hearing, Mr. Gustavo Hernandez (a former senior executive at GPT/DAK) also contended that it was not surprising to see a Polish company other than Indorama actually export the PET because the "PET supply chain" is "relatively complicated," and "it can involve several steps in the chain to get from the PET product itself all the way down to the retail market." (Jan. 8 Hr'g Tr. at 91.)

*Eighth*, beyond this circumstantial evidence of importation, two private research reports from a company called "QY Research" showed that approximately 179 tons (or $86,271 worth) of PET was shipped directly from Indorama Poland to the United States in 2016 by sea. (*See* Pls.' Ex. 3-4.) According to a declaration from Jayanta Shah, an individual who works for "WiseGuy Research Consultants," the publisher of QY Research, QY Research gleaned this export-import information from various Chinese customs repositories and trade associations. (*See* Pls.' Ex. 7.) GPT/DAK's witnesses claimed that these reports were reliable, too, because (a) the marketing division of GPT/DAK frequently relies on (and pays for) business reports like these in their regular course of business (*see, e.g.*, Jan. 8 Hr'g Tr. at 81-83) (Hernandez), and (b) QY Research's public client list lists dozens of well-known multinational corporations, including Polymetrix's parent company, Buhler (*see* Pls.' Ex. 42).

Further, although both reports describe total Polish exports of PET to the United States as "tiny" (indeed, the reports list no PET imports from Poland to the United States in 2013-2015 and 2017-2018), GPT/DAK's witnesses argued that the reports were noteworthy. This was so, not only because they (arguably) provide direct evidence of Indorama Poland's importation, but also because one of the reports (Pls.' Ex. 4) lists a company called "Alpla Caribe" as the PET importer; Alpla Caribe is a "major producer of bottles," and "part of a large international company that's well-known for making food packaging and bottles throughout the world." (Jan. 22 Hr'g Tr. at 34-35 (Schiraldi).) As Mr. Hernandez explained, when GPT/DAK's "customers [like Alpla Caribe] have the perception they can have an additional source of supply that is coming into the [United States]," such as from Indorama Poland, that perception "certainly puts some pressure on the supply/demand balance that affects prices and margins in our industry." (Jan. 8 Hr'g Tr. at 90.)

*Finally*, evidence adduced through GPT/DAK's private investigations suggests that a Polish company called "Hanex" regularly buys virgin PET from Indorama Poland, produces that PET into plastic bottle-grade packaging, and then sells that plastic packaging to a Polish company called "Maspex" for eventual importation into, among other places, the United States. (*See generally* Second Supp. Dec. of Eric W. Schweibenz [Doc. No. 394] (detailing an affidavit by Polish private investigator, Mr. Artur Janta-Lipinski, describing Mr. Janta-Lipinski's private investigation into Hanex and Maspex's Polish operations, and attesting that Hanex's product manager told him that Indorama Poland "has been Hanex's main supplier of PET resin for approximately the last five

14

years").) Indeed, Dr. Schiraldi discovered various plastic food packages made by "Maspex" when he visited a Polish convenience store in Northeast Minneapolis; he later submitted these food packages to the Court as evidence. (*See generally* Jan. 22 Hr'g Tr. at 56-72; Pls.' Ex. 51-61 (including, *inter alia*, a "Maspex-produced" Polish ketchup bottle, juice bottle, and sunflower oil bottle).) Notably, however, this evidence concerns imported *finished products*, which are, of course, distinguishable from imported *PET resins* produced through the EcoSphere process. (*See* Pls.' Ex. 9-11 (examples of "PET pellets").)

### C. Analysis

Because the parties do not appear to dispute the third *Lujan* factor of "redressability," the Court will determine whether this evidence, taken together, is sufficient to meet the factors of "injury-in-fact" and "causation." *Lujan*, 504 U.S. at 560-61.

As to "injury-in-fact," the Court finds that GPT/DAK has met its burden of proving an "injury in fact which is actual or imminent, not conjectural or hypothetical." *3M Co.*, 673 F.3d at 1377 (cleaned up). For one, because there is no dispute that GPT/DAK owns the at-issue patents, and is accusing Polymetrix's (currently active) EcoSphere process of infringing these patents, GPT/DAK has shown the prototypical "constitutional injury in fact" under Federal Circuit patent case law. *See Drone Tech., Inc.*, 838 F.3d at 1292 ("'Constitutional injury in fact' occurs when a party infringes a patent in violation of a party's exclusionary rights.").

15

Moreover, the Court finds that GPT/DAK's concerns about importation (and the accordant "supply/demand" injury described by Mr. Hernandez at 14, *supra*) are not "conjectural or hypothetical," *3M Co.*, 673 F.3d at 1377, nor based wholly "upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Sandoz, Inc.*, 773 F.3d at 1278. Although Polymetrix rightfully calls into question the reliability of the QY Research reports (*see, e.g.*, Polymetrix Supp. Br. [Doc. No. 395] at 3-6), the Court need not consider those reports at this stage because other evidence sufficiently demonstrates "injury-in-fact," namely, the CPB data (Pls.' Ex. 36) and the Wood McKenzie (Pls.' Ex. 1) and Global Data (Pls.' Ex. 5) reports, none of which Polymetrix attempted to call into question either at the hearing or in its supplemental briefing. From this evidence, the Court can conclude that the Indorama Poland plant was the only producer of virgin PET in Poland in 2016 and that an (admittedly small) amount of virgin PET was imported from Poland into the United States in 2016. When this evidence is considered alongside Dr. Schiraldi's (unrebutted) expert testimony that it is highly unlikely that a non-Polish company would ship virgin PET to Poland only to have a Polish company then air-mail that PET to the United States (*see supra* at 11-12), it not "conjectural" to conclude that the PET shipments referenced in the CBP data originated from the Indorama Poland plant. *3M Co.*, 673 F.3d at 1377. Of course, because Article III standing is a lower standard than "importation" under the Patent Act, *see Litecubes*, 523
16

F.3d at 1366, this evidence would not necessarily suffice to meet a Rule 56 challenge on the merits. But it does suffice for the limited inquiry before the Court.[7]

As for "causation," the Court finds that GPT/DAK has met its burden of showing that there is a "causal connection between the injury and the conduct complained of that is fairly traceable to the challenged action of the defendant," *3M Co.*, 673 F.3d at 1377, rather than the "independent actions" of foreign actors "not before the court." *Lujan*, 504 U.S. at 560. Again, as an initial matter, there is no dispute that the *infringement* GPT/DAK complains of is "traceable" to Polymetrix's behavior, namely, the EcoSphere process Polymetrix sold, and then installed, at the Indorama Poland plant. *See Pandrol*, 320 F.3d at 1368 ("Establishing ownership of a patent that has been infringed satisfies the requirements of Article III standing."). And, as the Court also noted above, with respect to the "injury" of importation, there is sufficient evidence to conclude that the PET shipments referenced in the CPB data are "fairly traceable" to the Indorama Poland plant's EcoSphere process, at least in the context of an Article III standing challenge. *3M Co.*, 673 F.3d at 1377. Indeed, as a general matter, given Dr. Schiraldi's testimony, it does not strike the Court as entirely speculative to assume that some PET produced with

---

[7] Because of this finding, the Court need not consider whether GPT/DAK's evidence of *finished products* entering the United States market provides non-conjectural evidence of an injury-in-fact. Moreover, to the extent Polymetrix challenges this evidence on grounds that Polish companies like "Maspex" and "Hanex" "materially changed" the PET produced using the EcoSphere process *before* importation, that argument goes exclusively to the merits, and may only be considered in conjunction with a Rule 56 motion. (*See* Polymetrix Supp. Br. at 10-11 (discussing 35 U.S.C. § 271(g), which states that imported products made using a patented process will not be considered "infringing" if the patented product was "materially changed by subsequent processes" before importation).)

the EcoSphere process has entered the United States, as the United States is the world's "second largest marketplace" for products made with PET. (*See* Jan. 8 Hr'g Tr. at 157 (Schiraldi).)

That said, even if some virgin PET traceable to Indorama Poland's EcoSphere process did enter the U.S. market, the Court is skeptical that, by merely selling Indorama Poland the EcoSphere system without inquiring into where the produced PET would go, and then offering general assurances of "FDA compliance" on its website, Polymetrix "knowingly" induced Indorama Poland, or any of Indorama Poland's clients, to export "infringing" PET into the United States, or was "willfully blind" to that possibility. *Global-Tech Appliances, Inc. v. S.E.B. S.A.*, 563 U.S. 754 (2011) (interpreting the Patent Act's prohibition on "induced infringement," 35 U.S.C. § 271(b), as having a "knowledge" requirement beyond "negligence" or "recklessness"); *compare, e.g., with Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1333 (Fed. Cir. 2016) (in a case described by GPT/DAK as "remarkably similar" to this one, finding that a foreign defendant with a "corporate culture of copying" knowingly induced U.S. businesses to import infringing "controller chips" by, *inter alia*, providing "demonstration boards" of the chips "to customers and potential customers in the United States," setting up a web page to "enable customers to locate a United States-based distributor that sold [the] infringing controller chips," and "maintain[ing] a technical support center in the United States that provided support for the infringing controller chips to customers based in the United States").

However, whether GPT/DAK has met its burden of proving Polymetrix's *mens rea* under the Patent Act's "inducement" standard is distinct from the (less demanding) inquiry of whether the infringement and importation "complained of" is "fairly traceable" to Polymetrix. *See Litecubes*, 523 F.3d at 1360-61 ("Subject matter jurisdiction does not fail simply because the plaintiff might be unable to ultimately succeed on the merits."). Because the evidence shows that GPT/DAK has met its burden under the latter standard, such that the Court can feel confident that this dispute is not "based upon hypothetical facts," *Teva Pharm.*, 482 F.3d at 1338, the Court need not consider the parties' arguments related to the merits of inducement. (*See, e.g.*, GPT/DAK Supp. Br. at 11-14, Polymetrix Supp. Br. at 11-14.)

* * * *

The Court's conclusion that GPT/DAK has met its burden of proof as to Article III standing should in no way be interpreted to suggest that GPT/DAK has met its burden of proof as to importation and inducement, much less infringement. Those remain questions for summary judgment or trial, after both sides have had a full and fair opportunity for discovery.[8]

---

[8] The Court is sympathetic to Polymetrix's position as a foreign defendant in a patent infringement lawsuit based primarily on allegations of induced, "supply chain" infringement, rather than direct infringement. However, the Court, like the Magistrate Judge, cannot "ignore the fact that [Polymetrix] has not only acknowledged this Court's jurisdiction over it for purposes of [GPT/DAK's] claims, but has brought counterclaims seeking affirmative relief." (Aug. 24, 2017 Order Granting in Part GPT/DAK's Motion to Compel [Doc. No. 100] at 13.) Therefore, Polymetrix, just like GPT/DAK, is dutybound to participate in the discovery process, in accordance with the (fair and proportional) dictates of Fed. R. Civ. P. 26(b)(1).

19

## II. ORDER

Based on the submissions and the entire file and proceedings herein, Defendant Polymetrix's Motion to Dismiss GPT/DAK's Complaint for Lack of Subject Matter Jurisdiction [Doc. No. 145] is **DENIED**. GPT/DAK's Motion to Strike Improper Argument from Polymetrix's Post-Hearing Reply Brief [Doc. No. 399] is **DENIED AS MOOT**. GPT/DAK's Request for Leave to File Additional Evidence and a Sur-Reply [Doc. No. 407] is **DENIED AS MOOT**.

This Order is filed under seal. Within seven (7) days of the date of this Order, the parties are **ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long. To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted order.

Dated: March 5, 2019            /s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Judge