## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Grupo Petrotemex, S.A. de C.V., and DAK Americas LLC, | Case No. 16-cv-02401 (SRN/HB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Polymetrix AG, | |
| Defendant. | |

Alexander Englehart, Eric W. Schweibenz, J. Derek Mason, and John F. Presper, Oblon, McClelland, Maier & Neustadt, LLP, 1940 Duke Street, Alexandria, VA 22314; Barbara Jean D'Aquila, Fulbright & Jaworski LLP, 60 South Sixth Street, Suite 3100, Minneapolis, MN 55402; Margaret Rudolph and Laura J. Borst, Norton Rose Fulbright US LLP, 60 South Sixth Street, Suite 3100, Minneapolis, MN 55402, for Plaintiffs.

Bernard E. Nodzon, Jr. and Lauren Marie Williams Steinhauser, Faegre Drinker Biddle & Reath LLP, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; Igor Shoiket, Stephen H. Youtsey, and Todd A. Noah, Dergosits & Noah LLP, One Embarcadero Center, Suite 350, San Francisco, CA 94111, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on cross-motions for summary judgment [Doc. Nos. 712, 769] filed by the parties. In addition, Plaintiffs Grupo Petrotemex, S.A. de C.V. and DAK Americas LLC (collectively, "GPT/DAK") move to strike the declaration of Puneet Saini [Doc. No. 760], as well as an errata sheet submitted following the deposition of Yash Awasthi [19-mc-0092, Doc. No. 71; 20-mc-0007, Doc. No. 83; 20-mc-0015, Doc. No. 68]. GPT/DAK also appeal Magistrate Judge Hildy Bowbeer's November 12, 2020 Order

denying GPT/DAK leave to amend the Complaint [Doc. No. 847]. Based on a review of the files, submissions, and proceedings herein, and for the reasons below, the Court **GRANTS** Defendant Polymetrix AG's Motion for Summary Judgment, **DENIES** GPT/DAK's Motion for Partial Summary Judgment and Motion to Strike the Saini declaration, **DENIES as moot** GPT/DAK's Motion to Strike Awasthi's errata sheet, and **OVERRULES** GPT/DAK's Objection and **AFFIRMS** the magistrate judge's Order denying leave to amend the Complaint.

## I.     BACKGROUND

This litigation presents a multi-continent patent infringement dispute between companies involved in the manufacture of "polyethylene terephthalate" resin, or "PET," which is used to create plastic bottles and containers. Plaintiffs Grupo Petrotemex, a Mexican company, and DAK Americas, its American affiliate and the exclusive licensee of the patents in suit, brought this lawsuit against Defendant Polymetrix, a Swiss corporation that designs, engineers, supplies, and builds plants that manufacture PET. GPT/DAK allege that Polymetrix's "EcoSphere" manufacturing process practices technologies claimed by the patents in suit, and that Polymetrix induced infringement of the patents in suit by equipping a Polish manufacturing plant, owned by Indorama Ventures Poland sp. z o.o. ("IVP"), with the EcoSphere process and causing PET manufactured at that plant to enter the United States.

At the outset, a brief overview of the legal standard applicable to GPT/DAK's claim is helpful. GPT/DAK charge Polymetrix with inducing infringement of the patents in suit

in violation of 35 U.S.C. § 271(b).[1] (Compl. [Doc. No. 1].) Under § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407–08 (Fed. Cir. 2018) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)). Proof of indirect infringement under § 271(b) requires the plaintiff to "prove that the defendants' actions led to direct infringement of the [patent-in-suit]." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1331 (Fed. Cir. 2016) (quoting *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1274 (Fed. Cir. 2004)) (alteration in original).

With respect to the first element—direct infringement—GPT/DAK invoke § 271(g), which provides that "[w]hoever without authority imports into the United States . . . a product which is made by a process patented in the United States shall be liable as an infringer, if the importation . . . occurs during the term of such process patent." 35 U.S.C. § 271(g). GPT/DAK contend that the record establishes two categories of "importation" of PET produced at IVP's plant using the accused EcoSphere process. First, GPT/DAK point to seven instances in which IVP sent PET samples produced at the Poland

---

[1] GPT/DAK originally alleged a contributory infringement claim under 35 U.S.C. § 271(c) as well, but this claim was dismissed by stipulation of the parties. (Order [Doc. No. 856].)

plant to sister companies in the United States. Second, GPT/DAK assert that PET produced by IVP found its way into the United States via IVP's customers.

In response, Polymetrix asserts that GPT/DAK have produced no evidence that Polymetrix caused the seven shipments to IVP's sister companies. Polymetrix also argues that GPT/DAK have not presented evidence connecting IVP—or Polymetrix—to the plastics imported into the United States via IVP's purported customers. Polymetrix therefore moves for summary judgment on GPT/DAK's induced infringement claim. GPT/DAK riposte that the record establishes, as a matter of law, that Polymetrix induced infringement of the patents in suit. Thus, GPT/DAK request summary judgment in their favor on their inducement claim; in the alternative, GPT/DAK argue that the record establishes at least a genuine factual dispute barring summary judgment in favor of Polymetrix.

Consistent with the parties' arguments and the standard governing induced infringement under § 271(b), the following recitation of the record will begin with Polymetrix's contract to equip IVP's manufacturing plant with the accused EcoSphere process. The Court will then examine the evidence produced concerning IVP's shipment of PET samples to its sister companies in the United States, as well as the evidence tying IVP to commercial importation of plastic products by IVP's alleged customers. Finally, the Court will address the record pertinent to GPT/DAK's Objection to the magistrate judge's Order denying GPT/DAK leave to file an Amended Complaint alleging direct infringement of the patents in suit.

## A.    Contract Between Polymetrix and IVP

In February 2013, Polymetrix[2] contracted with IVP to equip IVP's manufacturing plant located in Wloclawek, Poland with the accused EcoSphere process. (Decl. of Martin Müller ("Müller Decl.") [Doc. No. 716], at ¶ 3; *id.*, Ex. A ("Feb. 2013 Contract").) The contract was part of IVP's efforts to upgrade the capacity of its plant, and required Polymetrix to supply solid state polycondensation equipment, engineering services related to the installation of that equipment, and site assistance during plant start-up. (Müller Decl. ¶ 4.) Polymetrix's responsibility in upgrading IVP's facility did not extend to the continuous melt phase polymerization or underwater granulation stages of the manufacturing process—third parties were responsible for upgrading these processes. (*Id.*)

Polymetrix's work at IVP's plant was governed by a February 13, 2013 contract between Polymetrix and IVP. (*Id.* ¶ 3; *see* Feb. 2013 Contract.) At IVP's request to change the signatory to the contract, Polymetrix later signed a second contract dated January 22, 2014, which was countersigned by Indorama Netherlands B.V. (one of IVP's sister companies under the Indorama Ventures Public Company Limited ("Indorama Ventures") umbrella). (Müller Decl. ¶ 3; *see* Decl. of Eric Schweibenz ("Schweibenz Decl.") [Doc.

---

[2] To be precise, it was Polymetrix's predecessor—Büller Thermal Processes AG—that contracted with IVP. However, Polymetrix does not contend that the company's evolution is material to the parties' cross-motions for summary judgment. Accordingly, for clarity the Court will refer to Polymetrix and its predecessor as simply "Polymetrix," even when describing events that occurred when it was operating as Büller.

No. 777], Ex. A ("Jan. 2014 Contract").) But Polymetrix's work continued to be governed by the February 2013 contract.[3] (Müller Decl. ¶ 3.)

Polymetrix completed its work under the February 2013 contract on July 5, 2014. (*Id.* ¶ 8.) Thereafter, the February 2013 contract provided for a "commissioning period," which ran from June 25, 2014, "the date of mechanical completion of the plant," to May 22, 2015, the date Polymetrix and IVP signed a Plant Acceptance Certificate. (*Id.* ¶ 8.) Pursuant to the February 2013 contract, Polymetrix retained ownership of the equipment installed at the IVP plant during the commissioning period, until IVP made the final payment under the contract. (Feb. 2013 Contract § 15.) The contract required IVP to make the final payment after signing the Plant Acceptance Certificate, and required IVP to sign the Plant Acceptance Certificate if the equipment met certain technical requirements during a performance test. (*Id.* §§ 5.1, 9.3.1.)

Notably, the contract entitled Polymetrix to review the results of any performance tests conducted by IVP. (*Id.* at Annex 7, § 7.8.) The contract did not, however, specify whether IVP would analyze the PET produced during the performance tests at its Poland plant or through the laboratories of its sister companies abroad. (*See generally id.*)

---

[3] Although GPT/DAK cite exclusively to the January 2014 contract in their memoranda, they do not explicitly confront Polymetrix's assertion that the February 2013 contract governed Polymetrix's work at the IVP plant. In light of the unrebutted testimony by Müller—Polymetrix's Chief Executive Officer—that the February 2013 contract continued to govern the parties' relationship even after the parties signed the January 2014 agreement, the Court will refer only to the February 2013 contract. Regardless, the relevant provisions of the two contracts are identical, and analyzing the January 2014 contract instead would not alter the Court's rulings.

Nonetheless, in his August 10, 2020 deposition, Martin Müller—Polymetrix's Chief Executive Officer—testified that § 7.8 implicitly contemplates that the performance tests would be conducted entirely in Poland:

> [In § 7.8] it says clearly that we should have . . . access to the laboratories of the buyer, and it's very clear that this is the location where the plant is built. Nobody want to travel [sic] to another country during start-up to see what the lab is doing and flying [sic] back on-site. So it is very clearly defined that this relates to the labs on-site.

(Schweibenz Decl. [Doc. No. 777], Ex. H ("Müller Dep."), at 146.)

### B.    Shipment of PET Samples from IVP to AlphaPet and Auriga Polymers

The parties have identified seven instances in which PET produced at IVP's Poland plant—during and after the commissioning period—entered the United States. In each of the seven instances, IVP sent PET produced at its plant to two of its sister companies in the United States, AlphaPet, Inc. and Auriga Polymers, Inc., in order to conduct interlaboratory cross-checking on PET produced by IVP. (*See generally* Decl. of Puneet Saini ("Saini Decl.") [Doc. No. 720].)[4] Puneet Saini, the Director of IVP, explained in a declaration filed with Polymetrix's motion that Indorama Ventures—a petrochemicals producer with 120 manufacturing facilities in thirty-three countries—routinely uses interlaboratory cross-checking to calibrate its laboratories to ensure that each laboratory "yields the same or very similar results based upon the test performed." (*Id.* ¶ 7.) To that end, IVP "routinely" sends PET samples produced at its Poland plant to sister companies abroad, and routinely

---

[4] GPT/DAK have moved to strike the Saini declaration. Because the Court denies GPT/DAK's motion, *see infra* Part II.A, the Court will consider the Saini declaration in its recitation of the record.

receives samples from other facilities. (*Id.*) According to Saini, the cross-checking tests "have nothing to do with verifying the properties of the PET resin" or with determining compliance with government food-safety standards. (*Id.* ¶ 8.) Rather, "[e]ach Indorama Ventures facility performs its own testing to verify the properties of the PET resin manufactured at that plant as well as compliance with food safety guidelines," unless the testing is outsourced. (*Id.*)

As noted at the outset, Polymetrix's theory on summary judgment is that GPT/DAK have not raised a genuine fact dispute regarding whether Polymetrix caused IVP to send any of the seven PET samples to AlphaPet and Auriga. In turn, GPT/DAK's theory on causation asserts that Polymetrix's contract with IVP caused IVP to send samples to the United States during the commissioning period in order to evaluate whether the PET produced by the EcoSphere process met the contract's technical requirements. GPT/DAK also assert that Polymetrix ratified IVP's importation by relying on test results produced by AlphaPet in order to receive final payment under the contract. Because GPT/DAK's theories rest on samples imported during the commissioning period, only the three shipments of PET made during the commissioning period are relevant to the instant motions.

### 1.   July 7, 2014 Sample

On July 7, 2014, IVP sent two PET resin samples to Auriga. (*Id.* ¶ 9.) The first was a 5 kg sample of PET resin produced prior to Polymetrix's efforts to revamp the IVP plant. (*Id.*) The second was a 5 kg sample of PET resin produced after Polymetrix upgraded the

IVP plant. (*Id.*) Similar samples were sent to other Indorama Ventures laboratories in several other countries. (*Id.*)

According to Saini, IVP sent these samples "in order to perform inter-laboratory cross-checking of the laboratories at various Indorama Ventures companies," because "IVP wanted to confirm that its laboratory results comparing the properties of the PET resin produced at the IVP before and after the reavamping project [sic] were similar to the results obtained by the laboratories" in the other Indorama Ventures companies. (*Id.* ¶¶ 9-10.) Saini attests that "Polymetrix had no involvement in my decision to send the samples to Auriga," and neither he "nor anyone at IVP informed Polymetrix of the July 2014 Indorama Ventures inter-laboratory cross-checking before, during or after the cross-checking tests." (*Id.* ¶ 10.) He further states that the decision to conduct the July 2014 cross-checking "was solely an internal decision made by me," and "had nothing to do with testing the PET resin produced during the commissioning of the IVP plant" to ascertain the equipment's conformity with the "plant performance parameters" set forth in the contract. (*Id.* ¶¶ 12-13.) Indeed, Saini avers that IVP "has its own testing laboratories and performed all of the testing" to determine the equipment's conformity with the contract, and did not send samples to other Indorama Ventures laboratories for that purpose. (*Id.* ¶ 14.) Rather, "[a]ll of such testing was performed in-house at IVP's laboratories." (*Id.*)

### 2.    July 17, 2014 Sample (the "Gosain Sample")

From July 8 to July 17, 2014, Jay Gosain—an AlphaPet employee—visited the IVP plant to help set up IVP's cutting systems. (*Id.* ¶ 17; Decl. of John Presper [Doc. No. 822], Ex. A ("Sept. 2020 Awasthi Dep."), at 47, 78.) At the conclusion of his visit, Gosain

brought a PET sample, which included at least some PET produced by the EcoSphere process, back to AlphaPet. (Saini Decl. ¶ 17.) According to Saini, the decision to permit Gosain to take the July 17 sample was made by Saini, and Polymetrix was not involved in the decision. (*Id.* ¶¶ 18-19.) Saini attests that Gosain took the sample in order to perform interlaboratory cross-checking, and that AlphaPet's testing of the sample "had nothing to do" with the commissioning of IVP's plant. (*Id.* ¶ 20.) Polymetrix was not informed that Gosain took the sample, and the test results were not shared with Polymetrix. (*Id.* ¶¶ 19-20.) As with the July 7, 2014 samples, Saini "did not consult the contract between Polymetrix and IVP" before authorizing Gosain to take the sample. (*Id.* ¶¶ 16, 21.)

In contrast to Saini's declaration, GPT/DAK point to the following testimony of Yash Awasthi, as the representative of AlphaPet and Auriga, at his September 29, 2020 deposition conducted pursuant to Federal Rule of Civil Procedure 30(b)(6):

> Q.     But [Mr. Gosain] did bring PET back to the U.S. from the Polymetrix supplied equipment at the IVP plant, correct?
>
> A.     The sample he brought back was at the request of Mr. Puneet Saini to take back with him. . . .
>
> Q.     And was the sample that Mr. Gosain took back to the United States taken in order to perform interlaboratory cross-checking for Polymetrix?
>
> A.     Yes, **for Polymetrix**. They requested the sample to be sent to -- along with, and the results were provided to them of polymers and esterification sample. It was at the request of Mr. Puneet Saini, as I said.

(Sept. 2020 Awasthi Dep. at 84-85 (emphasis added).) The parties contest the significance of Awasthi's statement that Gosain brought the sample to AlphaPet "for Polymetrix." Polymetrix argues that Awasthi's statement was mistaken, as reflected by Awasthi's

attempt to correct his testimony during a break in the deposition and in an errata sheet. (*See*
*id.* at 94-99.) GPT/DAK, for their part, view the statement as a significant admission.

But it is clear, from Awasthi's testimony on September 29, 2020 as well as his prior
deposition, that Awasthi did not have personal knowledge of Saini's reason for requesting
that Gosain take the sample to AlphaPet.[5] Accordingly, insofar as Awasthi testified
regarding IVP's purpose in sending the Gosain sample, Awasthi's testimony is
inadmissible under Federal Rule of Evidence 602, and the Court will not consider it in
ruling on the parties' cross-motions for summary judgment. *See Brooks v. Tri-Sys., Inc.*,
425 F.3d 1109, 1112 (8th Cir. 2005) ("[D]eposition testimony must also be admissible to
be considered in ruling on a motion for summary judgment."); *Howard v. Columbia Pub.*
*Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004) ("We consider only admissible evidence and
disregard portions of . . . depositions that were made without personal knowledge . . . .");

---

[5] *See id.* at 73-74 ("Q. And why . . . did Mr. Gosain bring that sample into the United
States . . . ? A. He was just merely getting a sample that IVP requested him to carry to
analysis [sic]. . . . [H]e just brought the samples back which IVP had requested for
testing."); *id.* at 74-75 (stating that Puneet Saini directed Gosain to take the sample to
AlphaPet, and testifying, in response to the question "Do you know why IVP wanted the
shipment sent back with Mr. Gosain?", "This part we don't know."); *id.* at 104 (testifying,
when asked whether the purpose for sending the Gosain sample was interlaboratory cross-
checking, "We don't know. At least I don't know because it is their request. Generally
speaking, internally we don't seek requests on why are you sending the sample to me . . . .
It's pure speculation."); *id.* at 125-26 ("A. We are not aware of what was the purpose of
their request, what they needed. . . . Q. [W]hy would IVP have needed or wanted to do a
cross-check before the final performance test at the revamped plant? A. As I said, I cannot
speak on their behalf or why they needed this to be done."); Decl. of Todd Noah [Doc. No.
715], Ex. T ("July 2020 Awasthi Dep."), at 90 ("Q. What was the purpose of the testing?
A. I have no idea.").

Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").[6]

### 3.    October 27, 2014 Sample

Finally, on October 27, 2014, IVP sent a 30 kg PET sample to Auriga. (Saini Decl. ¶ 22.) Saini attests that he authorized IVP personnel to provide this PET sample to Auriga "in order to have Auriga make preforms on Auriga's Arburg injection molding machine and have those preforms analyzed in a laboratory." (*Id.* ¶ 22.) According to Saini, IVP could not make such preforms itself, because "IVP has limited downstream processing capabilities" and "does not have an injection molding machine," unlike Auriga. (*Id.*) Saini's decision to provide this sample "was solely an internal decision made by [Saini] in response to a request from Mr. Wim Hoenderdaal of Indorama Ventures Europe . . . and was completely independent of any action, knowledge, input, direction or control by or from Polymetrix." (*Id.* ¶ 23.) Saini never informed anyone from Polymetrix about the sample, and did not provide the resulting preforms or test results to Polymetrix. (*Id.*)

### 4.    Polymetrix's Use of AlphaPet's Test Results

In support of their argument that Polymetrix ratified IVP's shipment of test samples to AlphaPet and Auriga, GPT/DAK assert that Polymetrix incorporated the test results produced using these samples into its own documents at the conclusion of the

---

[6] Because the Court finds that Awasthi's testimony that the Gosain sample was delivered to AlphaPet "for Polymetrix" is inadmissible, it denies GPT/DAK's Motion to Strike Awasthi's errata sheet—which purported to change Awasthi's statement to "for IVP"—as moot.

commissioning period. GPT/DAK point primarily to a chart in a May 28, 2015 internal report drafted by Polymetrix, which discusses the revamped IVP plant's performance during the commissioning period. (Schweibenz Decl. [Doc. No. 777], Ex. I ("May 2015 Report").) Figure 4-1 in the May 2015 report contains a chart plotting intrinsic viscosity measurements taken during the commissioning of the IVP plant and during the performance test conducted in May 2015. (*Id.* at 40.) Dr. David Schiraldi, one of GPT/DAK's proffered expert witnesses, compared Figure 4-1 to an August 7, 2014 email from AlphaPet to IVP. (Decl. of Dr. David Schiraldi ("Schiraldi Decl.") [Doc. No. 774], ¶¶ 32-36; *id.*, Ex. C ("Aug. 2014 Email").) The August 2014 email bears the subject line "Poland Sample Results," and contains a table describing various measurements taken in a July 23, 2014 test; apart from the table, the only text in the body of the email is "Please find sample results below."[7] (Aug. 2014 Email at 2-3.) Dr. Schiraldi compared the July 23, 2014 test results in AlphaPet's email to what he identified as July 23, 2014 data displayed in Figure 4-1, and found that the measurements reported in AlphaPet's email "match up almost exactly" with the measurements displayed in Polymetrix's Figure 4-1. (Schiraldi Decl. ¶ 36.) Dr. Schiraldi did not, however, explain why the measurements aligned only "almost exactly," or otherwise describe any observed discrepancy between AlphaPet's email and Figure 4-1.

---

[7] According to Saini, the August 2014 email reflects the results of tests conducted on the Gosain sample. (Saini Decl. ¶ 18.)

GPT/DAK also highlight an excerpt from the August 10, 2020 deposition of Martin Müller, Polymetrix's Chief Executive Officer. Presenting the August 2014 email and Polymetrix's May 2015 report, counsel asked Müller:

> [T]he testing results shown in [the August 2014 email] and [Polymetrix's May 2015 report] confirm that some of Indorama's testing of commissioning period PET during the commissioning period occurred at Indorama labs in the U.S., correct?

(Müller Dep. at 142.) Müller replied:

> All I can say, in the Polymetrix document, I see many measurements by the local organization. **I see on the document only one measurement from AlphaPet**. That's all I can say, what I see.

(*Id.* (emphasis added).) The emphasized language, viewed in isolation, might suggest that Müller saw "one measurement from AlphaPet's email" in Polymetrix's May 2015 report— indeed, GPT/DAK have repeatedly represented the foregoing excerpt as such a "smoking gun" admission. Such a conclusion, however, is belied by Müller's testimony surrounding this statement. Müller testified unequivocally that he did not know whether the measurement was traceable to the AlphaPet email. (Müller Dep. at 129, 136-37, 142-43.)

Moreover, he explained that the May 2015 report, which reported daily measurements, must have incorporated measurements taken locally at the IVP plant—not measurements taken abroad:

> A.    All I can say in the Polymetrix document, you see all the measurements which have been done in Poland . . . .
>
> Q.    How do you know that all the measurements shown in [Polymetrix's May 2015 report] were done in Poland? . . .
>
> A.    You can only do it on-site if you make daily measurements. You cannot send it across the ocean and make a test two days in some other

14

> location and then wait for the result. These are daily results on this diagram.
> Must be on-site. . . .
>
> [T]he individual data points, they were generated daily by the plant measure.
> Otherwise, you can't make such a report. You cannot suck out these data
> points out of your thumb. Must be generated on -- during operation on a daily
> basis. Can only be from the local source. [sic]

(*Id.* at 137-38.) Müller further testified that every PET plant has the capability to take the

intrinsic viscosity measurements shown in the May 2015 report, and that even if IVP had

decided to outsource the performance tests incorporated in the report, it would not have

sent samples to the United States to do so. (*See id.* at 138-39 ("They have so many locations

in Europe, why you send it across the world . . . ? There's absolutely no reason for such a

philosophy or for such a hypothesis.").)

Polymetrix also filed a declaration by Andreas Christel, Director of Research and

Development for Polymetrix, explaining the basis for the May 2015 report. (Decl. of

Andreas Christel ("Christel Decl.") [Doc. No. 801].) Christel was involved in generating

the report, and attests that Polymetrix never received a copy of AlphaPet's August 2014

email. (*Id.* ¶ 2.) Moreover, Christel produced the spreadsheets Polymetrix used in creating

the report, and identified several significant discrepancies between the source data found

in those spreadsheets and the August 2014 email. (*Id.* ¶¶ 3-13.) First, Christel points out

that the intrinsic viscosity measurements displayed in Figure 4-1 include data from several

samples taken on each day, whereas the August 2014 email includes data taken only on

one day, July 23, 2014, at one time, 3:00 p.m. (*Id.* ¶ 8.) Second, Christel notes that Figure

4-1's timescale uses 10-day increments, which does not permit one to accurately identify

measurements representing a single day's data—as Dr. Schiraldi purported to do. (*Id.* ¶ 9.)

Third, Christel observes that the August 2014 email's data contained five digits after the decimal, which Dr. Schiraldi rounded to three decimal places prior to comparing the data to the May 2015 report. (*Id.* ¶ 10.) Finally, the source data for the May 2015 report contain only a few entries representing measurements taken at or around 3:00 p.m. on July 23, 2014, and those data do not match the figures reported in the August 2014 email. (*Id.* ¶¶ 11-13.)

### C.   Commercial Importation of Products Derived from Pet Produced by IVP

In addition to samples sent from IVP to AlphaPet and Auriga, GPT/DAK assert that PET produced at IVP found its way into the United States as commercial plastic products. GPT/DAK's theory is, in essence, that Eagle Distributors, Inc. imported food and beverages packaged in PET bottles or containers manufactured by Grupa Maspex sp. z o.o. ("Maspex"), a Polish company; that Maspex produced those bottles or containers using PET preforms purchased from GTX Hanex Plastic sp. z o.o. ("Hanex"); and that Hanex made those PET preforms using PET resin produced by IVP using the EcoSphere process. (*See* Mem. in Supp. of Cross-Mot. for Summ. J. [Doc. No. 771], at 30.)

To support the first stage of this theory, GPT/DAK offer the declaration of Bernadette Rafacz, the Sales Manager at Eagle Distributors, in which Rafacz identifies invoices and spreadsheets showing that Eagle Distributors imported food and beverages packed in bottles or containers purchased from Maspex. (Schweibenz Decl. [Doc. No. 776], Ex. Z ("Rafacz Decl."), at ¶ 8.) To establish the second stage of GPT/DAK's theory, GPT/DAK rely on Hanex's website, which appears to state "[t]he major companies

16

purchasing our PET preforms are . . . Maspex." (Decl. of Todd Noah [Doc. No. 715], Ex. R; *see also* Decl. of Pawel Lichociński ("Lichociński Decl.") [Doc. No. 773], Ex. E (reproduction of Hanex's website as of May 7, 2019, which states: "The largest customers receiving Hanex PET preforms are: Coca Cola, Refresco, Maspex [and five others].").)

However, during discovery this Court issued letters of request under the Hague Convention to Maspex (identified in the letters as "Maspex sp. z o.o.") and Hanex. (*See* Order [Doc. No. 450].) Although Hanex did not respond, an entity identified as "Maspex GMW sp. z o.o." did. (*See* Letter to Magistrate Judge [Doc. No. 574], Ex. A ("Maspex Response").) In its response, Maspex GMW stated that the information regarding Maspex's sales to Eagle Distributors and purchases from Hanex was insufficient to provide a response, because "[e]stablishing specific details is extremely difficult, considering their archival nature and the transformation of the company mentioned in the letter from the requesting court (i.e. Maspex z o.o.)." (*Id.* at 3.) Maspex GMW then stated, "please be advised that Maspex GMW sp. z o.o. did not order packaging/preforms at GTX Hanex Plastic sp. z o.o., and neither does it cooperate with [IVP]." (*Id.*) Despite the denial from Maspex GMW, GPT/DAK suggest that Maspex GMW, apparently a different entity than that identified in the letter of request, may not be the same Maspex entity that purchased preforms from Hanex and sold plastic products to Eagle Distributors. (*See* Mem. in Supp. of Cross-Mot. for Summ. J. at 31.) Although the Court issued a follow-up letter of request to Maspex GMW, that letter has gone unanswered. (*See* Letter to the Polish Ministry of Justice [Doc. No. 581].)

To establish the third stage of their theory—that Hanex made PET preforms using PET resin purchased from IVP—GPT/DAK point to the testimony of Maciej Sioda, IVP's sales manager. (Schweibenz Decl. [Doc. No. 777], Ex. AA ("Sioda Dep.").) Sioda testified unequivocally that Hanex is one of IVP's "biggest customers," and has been a customer for more than a decade. (*Id.* at 42-43, 46.) However, Sioda also testified that IVP does not sell PET resin directly to Maspex, and that he had never discussed Polymetrix with either Hanex or Maspex. (*Id.* at 44-45, 51-52.) In addition, Sioda testified that IVP does not market its PET resin in the United States. (*Id.* at 57-58.)

### D.    Motion to Amend the Pleadings

Having addressed the record pertinent to the parties' cross-motions for summary judgment, the Court will now turn to GPT/DAK's motion for leave to amend the Complaint. GPT/DAK filed their Complaint on July 12, 2016, asserting claims of indirect infringement under 35 U.S.C. § 271(b) and contributory infringement under § 271(c). (*See generally* Compl. [Doc No. 1].) On June 12, 2019, the Court entered an Amended Scheduling Order setting an October 16, 2019 deadline for any motions to amend the pleadings. (Am. Scheduling Order [Doc. No. 431].) On August 21, 2020, GPT/DAK moved to amend the Complaint to add a claim of direct infringement under 35 U.S.C. § 271(g). (*See* Prop. Am. Compl. [Doc. No. 683-1], at ¶¶ 21, 30.) GPT/DAK's direct infringement claim alleges that when IVP sent PET samples produced using the EcoSphere process to AlphaPet and Auriga, it acted as Polymetrix's agent, rendering Polymetrix vicariously liable for infringement. (*See* Mem. in Supp. of Mot. to Amend [Doc. No. 680].)

18

In a November 12, 2020 Order, the magistrate judge denied GPT/DAK's motion. (Order Denying Mot. to Amend [Doc. No. 832].) The magistrate judge reasoned that in order to assert their direct infringement claim, GPT/DAK would have needed "information sufficient to allege in good faith (1) that Polymetrix retained ownership of the EcoSphere equipment for a period of time after it was installed at the IVP plant, and (2) that IVP sent PET produced on that equipment during that period to the United States." (*Id.* at 7.) To support the first element, GPT/DAK point to the contract between IVP and Polymetrix and the Plant Acceptance Certificate, which were produced to GPT/DAK on August 12, 2019. (*Id.* at 7-8.) To support the second element, GPT/DAK rely on 1) a Polish shipping receipt, with an unclear date that appears to fall some time in 2014, reflecting the shipment of a 30 kg package of PET from IVP to Auriga; 2) the August 7, 2014 email from AlphaPet to IVP; and 3) the Rule 30(b)(6) deposition of Yash Awasthi, in which Awasthi connected the August 2014 email to the Gosain sample sent to AlphaPet during the commissioning period. (*Id.* at 8-10.) The shipping receipt was produced in discovery on February 26, 2019 and the August 2014 email was produced on August 6, 2019, but GPT/DAK conducted the Rule 30(b)(6) deposition on July 22, 2020. (*Id.* at 8-9.)

The magistrate judge concluded that by October 2019, GPT/DAK had sufficient information to allege in good faith that Polymetrix retained ownership of the EcoSphere equipment during the commissioning period, and sufficient information, "at the very least, to have reasonable suspicions" that IVP had sent PET produced using the EcoSphere process to the United States during the commissioning period. (*Id.* at 18-19.) Regarding Awasthi's July 22, 2020 deposition, the magistrate judge "struggle[d] to see how Awasthi's

19

speculation, months later, that the 'Polish test samples' email *might* refer to interlaboratory testing that *might* in turn have related to something 'new' was the kind of 'lightbulb moment' described by GPT/DAK." (*Id.* at 18.) Thus, the magistrate judge denied GPT/DAK's motion, "on the ground that it has not shown extraordinary circumstances pursuant to Local Rule 16.3(d) that explain its failure to move to amend the scheduling order before the deadline expired and for another ten months thereafter." (*Id.* at 19.)

## II.   DISCUSSION

### A.   Motion to Strike the Saini Declaration

Because GPT/DAK's Motion to Strike the Saini declaration affects the record reviewable in considering the parties' cross-motions for summary judgment, the Court will address it first. GPT/DAK argue that Polymetrix failed to disclose Saini as a witness pursuant to Federal Rule of Civil Procedure 26, and therefore move to strike his declaration under Rule 37(c) and this Court's Local Rule 37.

Rule 26(a) requires a litigant to make an initial disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A). This initial disclosure must be "based on the information then reasonably available." Fed. R. Civ. P. 26(a)(1)(E). Under Rule 26(e), a litigant must supplement its initial disclosure "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

20

Although Polymetrix did not disclose Saini in its Rule 26(a) initial disclosure, Todd Noah, counsel for Polymetrix, attests that the decision to rely on Saini's testimony was not made until August 24, 2020. (Decl. of Todd Noah [Doc. No. 785], at ¶ 2.) GPT/DAK argue that Polymetrix was required to supplement its initial disclosure once it determined that it would use Saini's testimony in support of its summary judgment motion. But Rule 26(e) requires a party to supplement its initial disclosure only "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process." Fed. R. Civ. P. 26(e)(1)(A); *Tomlinson v. J.B. Hunt Transp., Inc.*, 989 F. Supp. 2d 766, 776 (D. Minn. 2013) ("There is no requirement to supplement if the information was otherwise made known to the opposing party during the discovery process.").

GPT/DAK simply cannot credibly contend that Saini's identity and significance had not been made known to them during discovery. Saini is the Director of IVP—the entity Polymetrix allegedly induced to infringe the patents in suit. Polymetrix produced 1316 documents referencing Saini's name, including documents authored by or addressed to Saini; and AlphaPet and Auriga produced dozens more. (Decl. of Todd Noah [Doc. No. 785], at ¶ 3; *id.*, Exs. B, C.) Indeed, the August 2014 email from AlphaPet to IVP—which was produced in discovery in August 2019, and which forms the basis for GPT/DAK's argument that Polymetrix ratified IVP's importation of PET by using AlphaPet's test data—was addressed to Saini.[8] (*See* Aug. 2014 Email.) Consequently, this case differs

---

[8] Moreover, Saini's name is not buried in a long mailing list—his is the only name in the "to" line, and only one other individual is named in the "cc" line.

greatly from those cited by GPT/DAK, in which a name of questionable materiality was buried under thousands of pages of discovery. *See, e.g.*, *United States ex rel. Higgins v. Bos. Sci. Corp.*, No. 11-CV-2453 (JNE/TNL), 2020 WL 968218, at *10 (D. Minn. Feb. 28, 2020) (rejecting argument that a witness was made known through discovery where the witness was referenced "over 400" times, where that amounted to less than 2% of the 30,000 documents produced).

Therefore, the Court finds that Polymetrix was not required to supplement its initial disclosure under Rule 26(e). Consequently, the Court need not analyze whether Polymetrix's non-disclosure was harmless.[9] Because the Court finds that Polymetrix did not violate its obligations under Rule 26(e), it denies GPT/DAK's motion to strike, and will consider Saini's declaration in ruling on the cross-motions for summary judgment—to which the Court now turns.

### B.   Cross-Motions for Summary Judgment

#### 1.   Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[9] Nonetheless, the Court notes that, on September 21, 2020, Polymetrix offered to make Saini available for a three-hour deposition by videoconference on October 7 or 8, 2020. (Schweibenz Decl. [Doc. No. 763], Ex. B.) GPT/DAK declined that opportunity. (*See* Mem. in Supp. of Mot. to Strike [Doc. No. 762], at 13, n.2.) Although the Court acknowledges that the offered deposition time was limited and the proposed dates would fall after GPT/DAK submitted their cross-motion for summary judgment, the Court notes that the parties took a Rule 30(b)(6) deposition of Awasthi on September 29, 2020 and filed supplemental memoranda regarding his testimony.

Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, while a patentee may prove induced infringement by circumstantial evidence, a patentee nevertheless "must substantiate his allegations with 'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'" *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)) (alterations in original); *see Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988) (holding that intent to induce infringement may be proven by circumstantial evidence).

In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

### 2.    Analysis

As noted at the outset, GPT/DAK claim that Polymetrix is liable for induced infringement under 35 U.S.C. § 271(b). "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407–08 (Fed. Cir. 2018) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002)). "To prove inducement of infringement, the patentee must []show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016) (quoting *Astornet Techs. Inc. v. BAE Sys., Inc.*, 802 F.3d 1271, 1279 (Fed. Cir. 2015)) (alteration in original).

Viewing the record in the light most favorable to GPT/DAK, the Court finds that GPT/DAK have not created a genuine fact dispute regarding Polymetrix's inducement of IVP's direct infringement, nor have they created a genuine fact dispute regarding Eagle Distributors' direct infringement. Thus, GPT/DAK have not made "a showing sufficient to establish the existence of an element essential to [their] case," on which they "will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The Court will first address GPT/DAK's theory with respect to IVP.

24

### a.     Alleged Inducement of IVP

GPT/DAK argue that Polymetrix induced IVP to send PET produced by the EcoSphere process to its sister companies in the United States. With respect to the seven test samples sent from IVP to AlphaPet and Auriga, Puneet Saini—the Director of IVP—presented unrebutted testimony that the decision to send the samples was his alone. (*See generally* Saini Decl.) Apart from Awasthi's apparent misstatement that the Gosain sample was taken to AlphaPet "for Polymetrix"—which this Court has found inadmissible under Rule 602, *see supra* Part I.B.2—GPT/DAK have presented no evidence that Polymetrix directed IVP to send PET samples to the United States. Rather, GPT/DAK's causation theory rests on the contract between Polymetrix and IVP. GPT/DAK argue that the contract made final payment contingent on Polymetrix's equipment passing performance tests, that the contract permitted IVP to conduct those tests in its laboratories in the United States, and that therefore the contract required IVP to send samples to the United States. In short, GPT/DAK contend that "because the contract specifically required an infringing § 271(g) act by [Indorama Ventures] (PET testing from the revamp even in the U.S.), Polymetrix's intentional act of entering into this contract caused [Indorama Ventures] to directly infringe GPT/DAK's patents." (Mem. in Supp. of Cross-Mot. for Summ. J. at 13.) To support this argument, GPT/DAK cite *Gentile v. Sun Products, Inc.*, No. 05CV11885-NG, 2008 WL 11388661 (D. Mass. Sept. 19, 2008).

But *Gentile* reveals the flaw in GPT/DAK's causation-by-contract argument. There, the Court granted the patentee's motion for summary judgment, finding that a contract

provision established that the defendant knowingly induced infringement of the patents in

suit. *Id.* at *9. There, the contract between the defendant and the direct infringer provided:

> Franklin [the direct infringer] shall continue to manufacture and market the
> street hockey ball it has been manufacturing [i.e., the infringing product]
> unless and until it receives legal challenges from one or more third parties
> which, in the sole judgment of Franklin, would expose Franklin to liability if
> it continued to do so. In that event, Franklin shall be entitled to discontinue
> manufacturing the street hockey ball it is presently producing and may
> manufacture, distribute, advertise and sell the Street Hockey Ball replicating
> exactly the design and dimensions set forth in U.S. Patent 5,516,098.

*Id.* Thus, the contract in *Gentile* expressly required the directly infringing act—selling an

infringing street hockey ball.

By contrast, the contract between IVP and Polymetrix does not expressly require

IVP to test PET produced using the EcoSphere process in the United States. To be sure,

the contract does require IVP to conduct performance tests before payment becomes due,

and the contract also entitles Polymetrix to "receive during this period of time all results of

tests carried out in the laboratories, as far as they are in any connection to the plant

delivered by Seller." (Feb. 2013 Contract at Annex 7, §§ 7.8, 7.11.) Thus, the contract does

not say that IVP *cannot* test samples produced during the performance test in the United

States. But this is a far cry from the contract in *Gentile*. That the contract fails to specify

where the samples will be tested does not entail that IVP was *required* to use its United

States sister companies to conduct those tests—especially given the fact that the Indorama

Ventures corporate family operates more than one hundred facilities in thirty-three

countries. (Saini Decl. ¶ 7.) Moreover, Polymetrix's Chief Executive Officer explained that

§ 7.8 implicitly contemplates that the performance tests would be conducted in Poland,

because "it says clearly that we should have . . . access to the laboratories of the buyer, and it's very clear that this is the location where the plant is built. Nobody want to travel [sic] to another country during start-up to see what the lab is doing . . . ." (Müller Dep. at 146.) Because the contract does not itself *require* an infringing act, GPT/DAK's causation-by-contract argument is insufficient to defeat Polymetrix's motion for summary judgment.

GPT/DAK also argue that Polymetrix ratified IVP's infringing importation of PET samples by using test data generated by AlphaPet's analysis of the Gosain sample. But GPT/DAK have not raised a genuine dispute of fact regarding whether Polymetrix used AlphaPet's data. According to Saini, Gosain carried a PET sample to AlphaPet for interlaboratory cross-checking purposes, not for the performance test required by the February 2013 contract. (Saini Decl. ¶¶ 18-20.) The results of AlphaPet's testing were sent to Saini, and not shared with Polymetrix. (Aug. 2014 Email; Christel Decl. ¶ 2.) Although GPT/DAK argue that Polymetrix used AlphaPet's data in its May 2015 report, the only evidence that Polymetrix incorporated that data is a line drawn by Dr. Schiraldi on a small and blurry reproduction of the report's Figure 4-1. (Schiraldi Decl. ¶ 36.) Dr. Schiraldi's analysis of Figure 4-1, in his own words, established only that the data in the figure "match up almost exactly" with the measurements reported in AlphaPet's August 2014 email. (*Id.*)

The Court cannot see how, when comparing scientific measurements, an "almost exact[]" match establishes that the data represented in both sources is identical. Dr. Schiraldi did not explain why his conclusion was framed in such imprecise language. Regardless, Polymetrix submitted an analysis of the underlying data used in generating Figure 4-1, which point-by-point rebutted Dr. Schiraldi's conclusions. (*See* Christel Decl.)

Moreover, Müller testified that the very nature of the performance test—a daily examination of PET produced by the equipment—required IVP to conduct the test in its own laboratory, not in the AlphaPet laboratory across the Atlantic. (*See* Müller Dep. at 137-38.) Although GPT/DAK correctly note that had AlphaPet conducted the performance test, Polymetrix would have been contractually entitled to view the results, this proposition does not establish that AlphaPet in fact participated in the performance test, or that Polymetrix in fact received the results. Indeed, the evidence is to the contrary. (*See id.* at 137-39; Christel Decl. ¶ 2.)

Accordingly, the Court finds that neither GPT/DAK's causation-by-contract nor ratification theory is supported by sufficient evidence to withstand summary judgment.[10] The Court next turns to GPT/DAK's argument that Polymetrix induced Eagle Distributors to import PET products traceable to IVP.

### b.      Alleged Inducement of Eagle Distributors

As noted previously, GPT/DAK assert that PET produced at IVP using the EcoSphere process found its way into the United States as commercial plastic products. GPT/DAK's theory follows three stages: First, that Eagle Distributors imported food and beverages packaged in PET bottles or containers created by Maspex; second, that Maspex

---

[10] GPT/DAK also argue that because Polymetrix retained title to the equipment during the commissioning period, it was therefore the owner of PET produced by that equipment under Swedish law. (*See* Decl. of Sophia Spala [Doc. No. 778].) But GPT/DAK have not persuasively explained why, under American patent law, mere ownership of the EcoSphere equipment—or mere ownership of the PET produced using that equipment—is sufficient to render Polymetrix liable for induced infringement.

produced those bottles or containers using PET preforms purchased from Hanex; and finally, that Hanex made those PET preforms using PET resin produced by IVP using the EcoSphere process.

GPT/DAK have presented unrebutted evidence supporting the first and third stages of their theory. GPT/DAK produced documents showing that Eagle Distributors imports food and beverages purchased from Maspex in plastic bottles and containers manufactured by Maspex. (Rafacz Decl. ¶ 8.) In addition, IVP's sales manager testified that Hanex is one of IVP's "biggest customers" of PET resin. (Sioda Dep. at 42-43, 46.)

But the connection between Hanex's preforms and the Maspex food and beverage containers imported by Eagle Distributors remains murky. On the one hand, Hanex's website lists Maspex as a customer of Hanex preforms. (Lichociński Decl. [Doc. No. 773], Ex. E (reproduction of Hanex's website as of May 7, 2019, which states: "The largest customers receiving Hanex PET preforms are: Coca Cola, Refresco, Maspex [and five others].").) But on the other hand, in response to this Court's letter of request addressed to Maspex sp. z o.o., Maspex GMW sp. z o.o. stated that "Maspex GMW sp. z o.o. did not order packaging/preforms at GTX Hanex Plastic sp. z o.o., and neither does it cooperate with [IVP]." (Maspex Response at 3.) GPT/DAK suggest that, given Maspex GMW's name and the reference in its response to "the transformation of the company mentioned in the letter," Maspex GMW could be a different entity than the Maspex mentioned on Hanex's website.

However, GPT/DAK ultimately bear the burden to prove at trial that the very same Maspex entity that bought Hanex preforms made using EcoSphere PET used those

preforms to make the very same bottles and containers sold to Eagle Distributors.[11] Such a showing is required in order for GPT/DAK to establish the direct infringement element of their inducement claim. *See Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398, 407–08 (Fed. Cir. 2018) ("In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement . . . ." (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1304–05 (Fed. Cir. 2002))); 35 U.S.C. § 271(g) ("Whoever without authority imports into the United States . . . a product which **is made by a process patented** in the United States shall be liable as an infringer . . . ." (emphasis added)). At this stage, the Court has been presented with a website indicating that Maspex purchases preforms from Hanex, and a direct denial from "Maspex GMW" stating that Maspex GMW does not purchase Hanex preforms. In light of that denial, the Court finds that GPT/DAK's unsubstantiated speculation that there is another Maspex entity that *does* purchase Hanex preforms—and is *the very same* Maspex entity that uses those same preforms to manufacture the products sold to Eagle Distributors—is insufficient to create a genuine factual dispute.

The Court sympathizes with the difficulty GPT/DAK have faced in obtaining discovery from the foreign third parties involved in this case. But the fact that discovery has been difficult does not excuse GPT/DAK from carrying their burden of proof. Because

---

[11] Otherwise, GPT/DAK's theory falls prey to the fallacy of the undistributed middle term: Proof that some Maspex entity uses Hanex preforms to manufacture some of its products does not entail that the particular products sold to Eagle Distributers were in fact manufactured using Hanex preforms.

GPT/DAK have not presented sufficient evidence to raise a genuine factual dispute regarding Eagle Distributors' direct infringement, the Court finds that GPT/DAK have not made "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is therefore proper.

### 3.   Conclusion

In sum, the Court finds that GPT/DAK have not presented evidence sufficient to raise a genuine dispute of material fact regarding Polymetrix's causation of IVP's allegedly infringing activity. The February 2013 contract did not require IVP to infringe the patents in suit, and the evidence that Polymetrix ratified IVP's conduct is insufficient to defeat Polymetrix's summary judgment motion. Moreover, the Court finds that GPT/DAK have not presented evidence sufficient to raise a genuine dispute of material fact regarding Eagle Distributors' direct infringement of the patents in suit, a necessary element of their induced infringement claim. To be sure, GPT/DAK's strenuous assertion that induced infringement may be proven by circumstantial evidence is correct; but where the circumstantial evidence is so weak that a jury would be required to speculate or resort to "conjecture" or "fantasy," summary judgment is appropriate. *Moody v. St. Charles Cty.*, 23 F.3d 1410, 1412 (8th Cir.

---

[12] Because the Court concludes that GPT/DAK have not raised a genuine dispute of material fact regarding the direct infringement element of their inducement claim, the Court need not reach GPT/DAK's arguments regarding the knowledge, intent, and causation elements of their inducement claim.

1994). Such is the case here. Accordingly, the Court grants Polymetrix's motion for summary judgment and denies GPT/DAK's cross-motion.

### C.   Appeal from the Magistrate Judge's Order Denying Leave to Amend the Complaint

In reviewing an order from a magistrate judge on non-dispositive matters, such as a motion to amend the pleadings, the standard of review "is extremely deferential." *Magee v. Trs. of the Hamline Univ., Minn.*, 957 F. Supp. 2d 1047, 1062 (D. Minn. 2013). The Court must set aside portions of an order only if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. L.R. 7.1(b), 72.2(a)(3). "A decision is clearly erroneous when, after reviewing the entire record, a court is left with the definite and firm conviction that a mistake has been committed," and a "decision is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Knutson v. Blue Cross & Blue Shield of Minnesota*, 254 F.R.D. 553, 556 (D. Minn. 2008) (quotations omitted).

The magistrate judge found that by the time the deadline to file motions to amend the pleadings expired in October 2019, GPT/DAK had sufficient information to allege in good faith that Polymetrix retained ownership of the EcoSphere equipment during the commissioning period, and sufficient information, "at the very least, to have reasonable suspicions" that IVP sent PET produced using the EcoSphere process to the United States during the commissioning period. (Order Denying Mot. to Amend at 18-19.) The magistrate judge therefore denied GPT/DAK's motion "on the ground that it has not shown extraordinary circumstances pursuant to Local Rule 16.3(d) that explain its failure to move

to amend the scheduling order before the deadline expired and for another ten months thereafter." (*Id.* at 19.)

GPT/DAK object to the magistrate judge's Order on four grounds. First, they argue that the magistrate judge misapplied the legal standard applicable to motions to amend. According to GPT/DAK, they had shown "good cause" to amend the Scheduling Order under Local Rule 16.3(b), and that good cause necessarily established the "extraordinary circumstances" required under Rule 16.3(d). But "[t]he primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 717 (8th Cir. 2008) (quoting *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)). The magistrate judge found that "the information GPT/DAK had by October 16, 2019, even without the benefit of hindsight, laid a clear foundation for the claim they now seek to assert. It therefore should have prompted them to file, if not a motion to amend the Complaint, at least a motion to amend the applicable deadline, accompanied by an explanation of what additional information was needed and how and when it would be gathered." (Order Denying Mot. to Amend at 17.) Thus, the magistrate judge's ruling was based on her finding that GPT/DAK had enough evidence of direct infringement that they should have apprised the Court of the potential for this new claim, but they failed to do so until ten months after the deadline set in the Scheduling Order. This finding is tantamount to a finding that GPT/DAK did not diligently attempt to meet the Scheduling Order's requirements.

Moreover, a review of the record does not leave the Court "with the definite and firm conviction" that the magistrate judge's finding was mistaken. *Knutson*, 254 F.R.D. at

556 (quoting *Thorne v. Wyeth*, Civ. No. 06-3123, 2007 WL 1455989, at \*1 (D. Minn. May 15, 2007)). By October 2019, GPT/DAK had sufficient evidence to know that Polymetrix owned the equipment at the IVP plant during the commissioning period (June 25, 2014 to May 22, 2015), that IVP had shipped PET granules to Auriga in South Carolina some time in 2014, and that AlphaPet sent test results from a "Poland sample" to IVP on August 7, 2014. (*See* February 2013 Contract; Letter to Magistrate Judge [Doc. No. 432], Ex. A, at 33 (English translation of shipping receipt); Aug. 2014 Email.)

Although this information was insufficient to *prove* that the PET sent to the United States was manufactured using the EcoSphere process, it was sufficient to put GPT/DAK on notice that IVP likely sent PET produced using the EcoSphere process to the United States during the commissioning period.[13] Notwithstanding this knowledge, GPT/DAK did nothing to apprise the Court of the potential for a direct infringement claim until they filed their motion to amend, ten months later. And, like the magistrate judge, the Court "struggles to see" how Awasthi's equivocal July 22, 2020 testimony "was the kind of 'lightbulb moment' described by GPT/DAK." (Order Denying Mot. to Amend at 18.) Because GPT/DAK did not show diligence in attempting to comply with the Scheduling

---

[13] Notably, the question is not—as GPT/DAK characterize it—whether GPT/DAK had sufficient information to file a motion to amend the Complaint. Rather, the basis for the magistrate judge's decision was that GPT/DAK had sufficient information that they could be expected to apprise the Court of the potential for a new claim, more than three years into this litigation, by moving to amend the Scheduling Order—yet GPT/DAK did not.

Order, they did not show good cause, and the Court overrules their first objection to the magistrate judge's Order.

Second, GPT/DAK contend that the magistrate judge failed to address "key admissions" from Polymetrix's counsel and Awasthi. Namely, at a September 14, 2020 hearing, Polymetrix's counsel represented that he first learned that the August 2014 email referred to the Gosain sample while preparing the Saini declaration. (Letter to Magistrate Judge [Doc. No. 781], Ex. B, at 108.) In addition, Awasthi testified that he could deduce that the August 2014 email referred to the Gosain sample only because he knew that Gosain retrieved the sample in July 2014 and because of the Saini declaration. (Sept. 2020 Awasthi Dep. at 102-03.) But these "admissions" establish, at most, that as of October 2019 neither Polymetrix's counsel nor Awasthi knew with *certainty* that the August 2014 email referred to the Gosain sample. The magistrate judge did not find that GPT/DAK knew or should have known, with *certainty*, the factual bases for their direct infringement claim. Rather, the magistrate judge concluded that, based on the evidence GPT/DAK *did* have in October 2019, they should have apprised the Court of the potential claim by moving to amend the Scheduling Order. These "key admissions" do not alter that conclusion, and therefore do not provide a basis for reversing the magistrate judge's ruling.

Third, GPT/DAK object to the magistrate judge's references to the Saini declaration. The Court has now denied GPT/DAK's motion to strike the Saini declaration, *see supra* Part II.A. Moreover, it is clear from the Order that the magistrate judge analyzed

GPT/DAK's knowledge as of October 2019, without relying on the Saini declaration.[14] Accordingly, the Court overrules GPT/DAK's third objection.

Finally, GPT/DAK argue that the magistrate judge improperly based the Order on prejudice to Polymetrix, when Polymetrix did not assert prejudice as a ground for relief. But the magistrate judge mentioned prejudice only once, in passing. (*See* Order Denying Mot. to Amend at 4 ("Polymetrix opposes the motion to amend on the grounds of undue delay and prejudice.").) The magistrate judge's reasoning plainly had nothing to do with prejudice to Polymetrix. Accordingly, the Court overrules GPT/DAK's fourth and final objection, and affirms the magistrate judge's Order denying leave to amend the Complaint.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.   Defendant's Motion for Summary Judgment [Doc. No. 712] is **GRANTED**;

2.   Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 769] is **DENIED**;

3.   Plaintiffs' Motion to Strike [Doc. No. 760] is **DENIED**;

4.   Plaintiffs' Motions to Strike [19-mc-0092, Doc. No. 71; 20-mc-0007, Doc. No. 83; 20-mc-0015, Doc. No. 68] are **DENIED as moot**;

---

[14] GPT/DAK point primarily to footnote 5 of the Order, in which the magistrate judge referred to the Saini declaration several times. (*See* Order Denying Mot. to Amend at 11 n.5.) But the references to Saini's declaration relate to background facts, and are not relevant to the magistrate judge's analysis.

5. Plaintiffs' Objection [Doc. No. 847] to the Magistrate Judge's November 12, 2020 Order [Doc. No. 832] is **OVERRULED**;

6. The Magistrate Judge's November 12, 2020 Order [Doc. No. 832] is **AFFIRMED**; and

7. This Order shall be unsealed in its entirety twenty-one (21) days from the date it is filed, unless the parties show good cause for specific redactions herein. Accordingly, the parties shall promptly meet and confer regarding any redactions that may be required to protect confidential information, if any, referred to in this Order, and shall submit a joint letter within fourteen (14) days from the date this Order is filed, identifying with specificity what redactions they believe are required and the basis for those redactions.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 4, 2021                          s/Susan Richard Nelson
                                                 SUSAN RICHARD NELSON
                                                 United States District Judge